**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0934n.06

No. 10-3739

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 05, 2013
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| MARK LEYSE, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR |
| CLEAR CHANNEL BROADCASTING, INC.; | ) THE SOUTHERN DISTRICT OF OHIO |
| CLEAR CHANNEL COMMUNICATIONS, | ) |
| INC.; CRITICAL MASS MEDIA, INC. | ) AMENDED OPINION[*] |
| | ) |
| Defendants-Appellees. | ) |

Before:  KEITH, GRIFFIN, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  In 2005, Mark Leyse received a prerecorded telemarketing call from a Clear Channel radio station.  He sued Clear Channel for violating the Telephone Consumer Protection Act of 1991 (TCPA), Pub. L. No. 102-243, 105 Stat. 2394 (1991), which prohibits certain prerecorded telemarketing calls.  The district court dismissed the action, finding that the Federal Communications Commission (FCC) had issued regulations exempting the type of call at issue from the TCPA's prohibitions, that the FCC was authorized by Congress to do so, that the court should defer to the resulting regulation under *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984), and that the regulation passed muster under *Chevron*.

---

[*]This decision was originally issued as a "published decision" filed on September 6, 2012. The court has now designated the opinion as one not recommended for full-text publication.

-1-

On appeal, in addition to arguing over what deference the resulting regulation is due and whether the regulation binds the court under that level of deference, Clear Channel argues that the Hobbs Act deprives this court of subject-matter jurisdiction. While we ultimately conclude that the district court did not have subject-matter jurisdiction to consider Leyse's arguments about the procedural invalidity of the FCC regulations, both the district court and this court do have subject-matter jurisdiction to consider whether the call at issue in this case fits within the scope of that exemption. Because we find that it does, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In June 2005, a radio station owned by Clear Channel called Leyse's residential telephone number and delivered the following prerecorded message:

> Hi, this is Al "Bernie" Bernstein from 106.7 Lite FM. In case your favorite station went away, I want to take just a minute to remind you about the best variety of yesterday and today at 106.7. Motown, classic 70s from James Taylor, Elton, and Carole King; it's all here. Each weekday, we kick off the workday with an hour of continuous, commercial-free music. This week, when the music stops at 9:20, be the tenth caller at 1-800-222-1067. Tell us the name of the Motown song we played during that hour, and you'll win one thousand dollars. Easy money. And the best variety from 106.7 Lite FM.

Leyse filed a class-action complaint that same month against the defendants (collectively, "Clear Channel") in the United States District Court for the Southern District of New York, alleging that the prerecorded telephone call violated the TCPA, 47 U.S.C. § 227(b)(1)(B), and the corresponding regulation 47 C.F.R. § 64.1200(a)(2). The New York district court granted Clear Channel's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure because the court concluded that the FCC had exempted the type of call at issue from the TCPA's prohibitions against prerecorded calls. *Leyse v. Clear Channel Broad., Inc.*, No. 05 CV 6031 HB, 2006 WL 23480 (S.D.N.Y. Jan. 5, 2006). The court held that the FCC's

determination was entitled to deference under *Chevron* because Congress expressly authorized the FCC to "implement and create exemptions to § 227" and because the exemptions created under this authority were promulgated after notice-and-comment rulemaking. *Id.* at 3.

Leyse appealed to the Second Circuit. During the appeal, the FCC submitted a letter responding to questions posed by the Second Circuit in which the FCC stated its position that the call at issue did not violate § 227 because the FCC had exempted such calls. In the letter, the FCC also argued that the agency's 2003 rule delineating the exemption was protected from collateral attack by the Federal Communications Act and the Hobbs Act, which together "specify the precise procedure for obtaining judicial review of FCC orders and vest exclusive jurisdiction in the courts of appeals." The Second Circuit dismissed the action without prejudice for lack of a federal question and did not reach either the merits of Leyse's arguments or the jurisdictional question posed by the FCC. *Leyse v. Clear Channel Broad., Inc.*, 301 F. App'x 20, 21–22 (2d Cir. 2008).

In April 2009, Leyse filed the present action—one materially identical to the New York action—in Ohio. In May 2009, Clear Channel filed a motion to dismiss for failure to state a claim and the district court granted that motion in June 2010. In doing so, the court concluded that the FCC had exempted the type of call at issue here, a "hybrid call" that both announces a contest and promotes the station generally. The court accorded *Chevron* deference to the FCC's decision to exempt the call, reasoning that Congress expressly delegated to the FCC the power to decide what calls to exempt, that the FCC exercised this power through "notice-and-comment rulemaking procedures in the 2003 and 2005 Orders," and that the FCC had consistently articulated its position.[1]

---

[1]The court also correctly held that the federal-question defect seized on by the Second Circuit no longer existed because of a rule set forth in an intervening Supreme Court opinion. This holding is not challenged on appeal.

-3-

Leyse timely appealed the district court's decision. On appeal, he again argues that Clear Channel's message was "not within the scope" of the FCC's exemption. He also argues that even if the message were covered by the exemption, this court should undertake a *Chevron* analysis and refuse deference to the FCC's rule based on a number of procedural infirmities, including: that the rule was "interpretative" as it was only interpreting existing law; that it was not a "logical outgrowth" of the FCC's Notice of Proposed Rulemaking (NPRM); that the FCC had not made the findings required by the TCPA statute as part of the rulemaking; that the reasoning supporting the rule is at odds with reasoning supporting other FCC rules under the TCPA; that comments during the NPRM overwhelmingly opposed exemption of the type of call at issue; and that factual findings about the absence of complaints did not support the order's reasoning. As a result, Leyse argues, the rule is arbitrary and capricious and therefore invalid.

In response, Clear Channel argues that the Hobbs Act precludes subject-matter jurisdiction in this case and that the district court's dismissal should be affirmed. Clear Channel contends that the Hobbs Act and the Federal Communications Act, 47 U.S.C. § 402(a), operate together to deprive the district court below (and this court on appeal) of jurisdiction to consider Leyse's lawsuit under the TCPA. In Clear Channel's view, Leyse's lawsuit is an impermissible collateral attack on the FCC's decision to permit the challenged call and others like it.

## II. STANDARD OF REVIEW

We review the district court's decision to grant a motion to dismiss de novo. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009).

## III. ANALYSIS

The Hobbs Act and the Federal Communications Act work in tandem to confine the jurisdiction of federal courts over efforts to invalidate certain actions by the FCC. The Federal Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter . . . shall be brought as provided by and in the manner prescribed in [the Hobbs Act]." 47 U.S.C. § 402(a). And the Hobbs Act provides that "[t]he court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342. The Hobbs Act contains a further temporal restriction on the jurisdiction of the courts of appeals, stating that "[a]ny party aggrieved by the [FCC's] final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies." *Id.* § 2344.

As an initial matter, we note that resolving a TCPA claim like Leyse's does not *necessarily* implicate the Hobbs Act. Leyse's argument proceeds in two parts: First, he argues that Clear Channel's call simply did not fit within the TCPA exemption the FCC had created by rule. Second, and only if he loses on this first argument, Leyse argues that the FCC rule should not be enforced pursuant to a *Chevron* analysis. Thus, we only reach the question of Hobbs Act and its jurisdictional restrictions if we disagree with Leyse as to the scope of the FCC's rule. *See CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 446 n.3 (7th Cir. 2010) ("Although the Hobbs Act prevents the district court from considering the validity of final FCC orders, the court retains jurisdiction to determine whether the parties' actions violate FCC rules.").

**A.      Scope of the FCC's rule**

Leyse argues that the prerecorded call he received lies outside the category of calls the FCC exempted from the TCPA's prohibitions.  We disagree.

The TCPA (codified in relevant part at 47 U.S.C. § 227) regulates telemarketing.  Congress found that telemarketing was pervasive and that "[u]nrestricted telemarketing . . . can be an invasion of privacy."  TCPA §§ 2(1), 2(5).  Federal law was therefore needed to balance "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade . . . in a way that protects the privacy of individuals and permits legitimate telemarketing practices."  *Id.* § 2(9).  And Congress explicitly found that the "Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance to privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment."  *Id.* §2(13).

The TCPA's provisions prohibiting prerecorded calls—which also exempt certain prerecorded calls from that prohibition—provide, in relevant part, as follows:

(b)  Restrictions on the use of automated telephone equipment

(1) Prohibitions
It shall be unlawful for any person within the United States . . .

.    .    .

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, *unless the call is . . . exempted by rule or order by the Commission under paragraph (2)(B)*;

.    .    .

(2) Regulations; exemptions and other provisions

The *Commission shall prescribe regulations* to implement the requirements of this subsection.  In implementing the requirements of this subsection, *the Commission--*

. . .

    (B) *may, by rule or order, exempt from the requirements of paragraph (1)(B)* of this subsection, subject to such conditions as the Commission may prescribe--

. . .

        (ii) such classes or categories of calls made for commercial purposes as the Commission determines--

        (I) will not adversely affect the privacy rights that this section is intended to protect; and

        (II) do not include the transmission of any unsolicited advertisement.[2]

47 U.S.C. § 227(b)(1), (b)(2) (emphasis added). So in § 227(b)(2), Congress expressly (1) mandates that the FCC prescribe regulations to implement the subsection, and (2) gives the FCC the power to exempt prerecorded, commercial calls from the general prohibition on prerecorded calls to a residential phone line.

In 1992, the FCC began and completed the notice-and-comment "rulemaking mandated by the statute," in which it, among other things, "define[d] the contours of statutorily permissible exemptions to the prohibitions of the statute." *Notice of Proposed Rulemaking*, 7 FCC Rcd. 2736, ¶ 1 (Apr. 17, 1992) (1992 NPRM); *accord in re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, ¶¶ 2-5 (Oct. 16, 1992) (1992 Report and Order). The FCC exempted prerecorded calls "that [are] made for a commercial purpose but do[] not include the transmission of any unsolicited advertisement."[3] 47 C.F.R. § 64.1200(c)(2) (1992); *accord* 1992

---

[2]An *unsolicited advertisement* is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

[3]The FCC's definition of *unsolicited advertisement* is materially identical to Congress's definition in § 227. *Compare* 47 U.S.C. § 227, *with* 47 C.F.R. § 64.1200(f)(5) (1992).

Report and Order ¶ 5, Appendix B. In formulating this rule, the FCC reasoned that "[s]ome messages, albeit commercial in nature, do not seek to sell a product or service and do not tread heavily upon privacy concerns." 1992 NPRM ¶ 11.

In April 2000, a member of the public, Robert Biggerstaff, asked the FCC to clarify its exemption decision in several respects, including how it applied to prerecorded calls from television and radio stations. Biggerstaff noted that "television and radio stations are using recorded messages to solicit consumers to tune into their broadcasts." He argued that these prerecorded calls should not be exempt from § 227(b)'s prohibitions, reasoning that "radio and TV stations are commercial entertainment 'services' and make money from the viewers—even if the consumer is not paying the station directly for the 'service.' In addition, the viewers receive advertising when they tune in."

The FCC addressed Biggerstaff's request along with many other matters in its new notice-and-comment rulemaking that began in 2002 and was completed in 2003. *Notice of Proposed Rulemaking*, 17 FCC Rcd. 17459, ¶¶ 1, 13, n.122 (Sept. 18, 2002) (2002 NPRM); *in re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (July 3, 2003) (2003 Report and Order). The FCC's decision to reevaluate these rules, which entails public input, was related to heightened privacy concerns prompted by advances in technology, changes in telemarketing practices, and increases in the amount of telemarketing. 2002 NPRM ¶¶ 1, 7, 11.

The FCC specifically sought comment on issues related to "prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or some similar opportunity." *Id.* at ¶ 32. The footnote following this sentence referenced Biggerstaff's request for clarification. *Id*. at ¶ 32, n. 122. More

broadly, the FCC asked whether these kinds of prerecorded calls needed to be specifically addressed and what kinds of rules would strike the appropriate balance between "consumers' interest in restricting unsolicited advertising with commercial freedoms of speech?" *Id.* at ¶ 32.

Commenters addressing this question divided into two camps that both framed the issue broadly.

> A number of commenters, including litigants and attorneys for litigants in TCPA cases, expressed the views that calls from broadcasters are inherently commercial because such calls are intended to increase the station's audience to become more attractive to advertisers. For example, one commenter argued that calls "need not offer something for sale to nonetheless still have advertised the commercial availability or quality of a product or service[.]" . . .
>
> Broadcasters took the opposite tack. The National Association of Broadcasters (NAB) argued that "free over-the-air radio and television broadcasts are not consumer products or services that are bought and sold in commercial transactions. Instead, over-the-air radio and television broadcasts are sources of news, information and entertainment programming that are by federal mandate available for free to every person within a station's listening or viewing area." Thus, according to the NAB, broadcast programming is "not 'commercially' available to listeners and viewers," and therefore "concepts of 'commercial' availability or quality simply have no applicability to the programming that broadcasters transmit over the public airwaves." [The NAB therefore concluded that] "broadcast audience invitation calls, which do not seek to sell a product or service, are not advertisements."

(Apr. 11, 2007 FCC Letter at 3–4 (citations omitted).)

> The FCC sided with the NAB in the resulting 2003 Report and Order, stating that
>
> [t]he Commission sought comment on prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or similar opportunity. . . . Few commenters in this proceeding described either receiving such messages or that they were particularly problematic. The few commenters who addressed the issue were split on whether such messages fall within the TCPA's definition of "unsolicited advertisement" and are thus subject to the restrictions on their delivery. We conclude that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the current rules as a commercial call that "does not include the transmission of any unsolicited advertisement" and under the amended rules as "a commercial call that does not

-9-

include or introduce an unsolicited advertisement or constitute a telephone solicitation." The Commission reiterates, however, that messages that are part of an overall marketing campaign to encourage the purchase of goods or services or that describe the commercial availability or quality of any goods or services, are "advertisements" as defined by the TCPA.

2003 Report and Order ¶ 145 (footnotes omitted). The FCC did distinguish between messages that invite a consumer to listen to or view a free broadcast and "messages that encourage consumers to listen to or watch programming . . . for which the consumer must pay (e.g. cable, digital satellite, etc.), [which] would be considered advertisements for purposes of our rules." *Id.* at ¶ 145 n.499.

In April 2005, the FCC issued its final rule, reaffirming its position exempting prerecorded calls that invited a "consumer to listen to or view a broadcast" from § 227(b)'s prohibition. *Final Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 70 Fed. Reg. 19330-01, 19335 (April 13, 2005) (2005 Final Rule). This final rule was promulgated through notice-and-comment rulemaking in which the FCC considered comments, applications for reconsideration, oppositions, and replies. *Id.* at 19330–32. In fact, the FCC denied a petition for reconsideration from Biggerstaff that challenged—for essentially the same reasons advanced in his request for clarification in 2000—the FCC decision to exempt broadcaster prerecorded calls. *Id.* at 19336.

The FCC has even opined in its letter to the Second Circuit that the exact call at issue in this case—which it characterizes as a "hybrid call that both announces a contest and contains a general promotion for the station"—is exempt and therefore permissible under the TCPA. (Apr. 11, 2007 FCC Letter at 6-9.) The FCC argues that the "2003 TCPA Order makes clear that neither telephone messages containing general promotional announcements for broadcast stations nor messages inviting the recipient to listen to specific broadcasts are 'unsolicited advertisements.' Both are thus

-10-

permitted under the rules." (*Id.* at 7.) The key principle underlying the FCC's conclusion is "the idea that over-the-air broadcasts inherently are not commercial." (*Id.* at 8) That principle underlies the distinction the FCC draws between an "over-the-air broadcast and a paid-for service" because that principle is the

> only rationale that explains why the Commission treated differently two telephone messages concerning the same programming: a telemarketing message that promotes a free broadcast show is deemed not to address the commercial availability or quality of the programming (and is within the Commission's statutory discretion to exempt it from TCPA restrictions), but a promotion for programming—even the very same programming—provided by a paid-for service is deemed a commercial advertisement that is barred under the statute. . . . In light of that rationale, it follows directly that the exemption covers both specific and general promotions for broadcast programming provided without charge to the listener.

(*Id.*)

In the face of the three consistent positions taken by the FCC—the 2003 Report and Order, the 2005 Final Rule, and the 2007 FCC Letter—Leyse argues that the FCC exemption decision does not extend to the call he received because that call promoted a broadcast *and* the radio station generally, but the exemption in his view covers calls promoting *only* a broadcast. Although a promotion for a broadcast is distinguishable from a promotion for a station, this distinction is trivial. Broadcasts appear on stations and by promoting a broadcast, the promoters are also impliedly promoting the station on which that broadcast appears. But even if the distinction Leyse draws were meaningful, the key principle underlying the exemption extends to calls promoting specific broadcasts or a radio station generally or both. Leyse's argument therefore fails. The FCC has decided to exempt this type of phone call from § 227(b)'s prohibitions.[4]

---

[4]In its letter to the Second Circuit, the FCC states that it has determined that the phone call at issue fit within the scope of the exemption. The FCC then argues that a federal court disagreeing with such an interpretation should refer the question to the Commission for the agency to formally

Having found that Clear Channel's call fits within the TCPA exemption created by the FCC, we turn to Leyse's alternative argument.

## B.     *Chevron* **deference**

Leyse argues that this court should consider and reject the FCC exemption rulemaking because it is neither binding nor persuasive authority under the familiar *Chevron* two-step framework for considering "an agency's construction of the statute which it administers." *Chevron*, 467 U.S. at 842. In response, Clear Channel argues that the *Chevron* framework is precisely the type of inquiry that the Hobbs Act vests within the exclusive purview of the Courts of Appeals. Thus, they argue, the district court did not have subject-matter jurisdiction to reach the *Chevron* analysis and we have no jurisdiction to do so in this appeal. In support, Clear Channel cites *CE Design*, in which the Seventh Circuit held that the district court lacked jurisdiction to apply step one of the two-part *Chevron* test. 606 F.3d at 447–49 & n.5. For his part, Leyse claims that the Hobbs Act does not apply here because (1) the FCC rule at issue was not an "order" within the meaning of the Hobbs Act and the Federal Communications Act (FCA), and (2) the suit is not a "proceeding to enjoin" the FCC rule, within the meaning of the FCA.

We generally consider questions of subject-matter jurisdiction before resolving questions on the merits. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 400 (6th Cir. 2008). In this case, however, Leyse's first argument as to why the Hobbs Act does not apply in this case circles back to his arguments about *Chevron* deference. Thus, for the sake of clarity, we will start by considering the merits of Leyse's *Chevron* argument, and then turn back to the jurisdictional provisions of the

---

resolve the matter under the doctrine of primary jurisdiction. Because we do not disagree with the FCC's interpretation of its own rule in this instance, we do not need to address this argument.

Hobbs Act.

An "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Express congressional authorization to engage in notice-and-comment rulemaking is "a very good indicat[ion]" that Congress delegated authority to the agency. *Id.* at 229–30. "Thus, the overwhelming number of our cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking . . . ." *Id.* at 230. Put another way, if Congress explicitly leaves gaps in the statutory scheme for the agency to fill, then Congress has expressly delegated "'authority to the agency to elucidate a specific provision of the statute by regulation.'" *Id.* at 227 (quoting *Chevron*, 467 U.S. at 844). "[A]nd any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.*

The present case possesses the factors that the Supreme Court found significant in granting *Chevron* deference. Section 227(b)(2)—which, among other things, sets forth the types of prerecorded calls that regulation could exempt from the TCPA's prohibitions—authorizes and requires the FCC to promulgate implementing regulations: "The Commission shall prescribe regulations to implement the requirements of this subsection." And § 227(b)(2)(B) authorizes the FCC, "by rule or order, [to] exempt from the [prohibition regarding prerecorded calls] . . . (i) such classes or categories of calls made for commercial purposes as the Commission determines (I) will not adversely affect . . . privacy rights . . .; and (II) do not include the transmission of any unsolicited advertisement." So the statute both explicitly leaves gaps for the FCC to fill and

-13-

authorizes and requires the FCC to engage in notice-and-comment rulemaking. Congress also made clear through its statutory findings that it envisioned a large role for the FCC in crafting rules that strike the appropriate balance between protecting consumers' privacy and permitting legitimate telemarketing:

> While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

TCPA § 2(13); *accord* TCPA § 2(9). In sum, the statute is replete with evidence that Congress intended the FCC to promulgate rules carrying the force of law that determine what kinds of prerecorded calls are permissible and what kinds are not.

And the FCC was similarly clear that it was exercising that authority in promulgating rules through notice-and-comment rulemaking. The FCC issued Notices of Proposed Rulemaking in 1992 and 2002; received and considered comments, requests for clarification, and petitions for reconsideration; and completed its rulemaking in Orders and a Final Rule that set forth the basis for its determination. *See* 5 U.S.C. § 553(b)–(e) (setting forth the requirements for notice-and-comment rulemaking, among other things). Because Congress intended the FCC to set forth legally binding rules governing which prerecorded calls are permissible, and because the FCC's exemption decision was promulgated in the exercise of that authority, that decision qualifies for *Chevron* deference. *See Mead*, 533 U.S. at 226–27.

Leyse argues that *Chevron* deference does not apply because the FCC's exemption decision

is an interpretive rule rather than a legislative rule. A fundamental flaw with this argument is that even if Leyse is correct that the FCC's decision was an interpretive rule, *Chevron* deference would still apply. *Mead* held that an

> administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

533 U.S. at 226–27. So the key inquiry is whether Congress delegated the necessary authority, not whether the rule is termed interpretive or legislative. The necessary authority was unquestionably delegated here. As discussed above, Congress expressly delegated authority to the FCC to make exemption decisions carrying the force of the law. 47 U.S.C. § 227(b)(2) (requiring rulemaking and explicitly leaving gaps for the FCC to fill in § 227(b)(2)(B)). And the FCC exercised that authority by crafting the exemption decision through notice-and-comment rulemaking. 2002 NPRM; 2003 Report and Order; 2005 Final Rule. The FCC's decision is therefore entitled to *Chevron* deference under *Mead*.

Leyse attempts to escape this conclusion by arguing that the FCC's exemption decision was not a logical outgrowth of the 2002 NPRM. Final rules adopted through notice-and-comment rulemaking "must be a logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (internal quotation marks omitted). That principle stems from 5 U.S.C. § 553(b)(3), which requires an agency engaged in "notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Id.* (quoting 5 U.S.C. § 553(b)(3)). The logical-

-15-

outgrowth rule is used to ensure that § 553(b)(3)'s object—fair notice—is satisfied. *Id.*

The 2002 NPRM stated, among other things, the following:

[W]e also seek comment on prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or some similar opportunity. Does the Commission need to specifically address these kinds of telemarketing calls, and, if so, what rules might we adopt to appropriately balance consumers' interest in restricting unsolicited advertising with commercial freedoms of speech?

2002 NPRM ¶ 32. Prerecorded calls from broadcasters that encourage consumers to tune in at a particular time for a chance to win a prize obviously invite the consumer to tune into the broadcast occurring at that time. So the FCC was providing notice that it was considering calls that promoted broadcasts, and more generally, stations themselves, since calls promoting broadcasts also promote the stations those broadcasts appear on. In the 2005 Final Rule, the FCC "concluded that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the rules as a commercial call that does not include or introduce an unsolicited advertisement or constitute a telephone solicitation." 70 Fed. Reg. 19330, 19335. This final rule flows logically from the 2002 NPRM.

Moreover, several commenters—including at least three and possibly four individuals who, like Leyse, believed that prerecorded calls promoting a station violated the TCPA—responded to the broader issue of whether calls inviting consumers to tune into broadcasts or stations are prohibited under the TCPA. 2003 Report and Order ¶ 145 n. 498 (summarizing comments). And comments that address the issue resolved in the Final Rule provide evidence that the notice was adequate. *See Ne. Md. Waste Disposal Auth. v. Envtl. Prot. Agency*, 358 F.3d 936, 952 (D.C. Cir. 2004). Because fair notice was provided, the FCC's exemption decision was a logical outgrowth of the proposed rule. So the notice-and-comment rulemaking was valid, and the FCC decision

resulting from that rulemaking is entitled to *Chevron* deference.

We turn now to whether the Hobbs Act deprives the district court or this court of jurisdiction to apply a *Chevron* analysis.

**C.     The Hobbs Act**

The Hobbs Act provides courts of appeal with exclusive and time-limited jurisdiction over actions "made reviewable by section 402(a) of title 47," 28 U.S.C. § 2342(1), and that section makes reviewable "[a]ny *proceeding* to enjoin, set aside, annul, or suspend any *order* of the Commission under this chapter," § 402(a) (emphasis added). Leyse argues that the Hobbs Act does not govern jurisdiction in this case because the FCC rule at issue here is not an "order," and that his suit is a not a "proceeding" with an objective made improper by the language of § 402(a).

The *Chevron* explanation above was undertaken because it is directly relevant to Leyse's first argument—that the Hobbs Act does not limit jurisdiction because the rule at issue here is not an "order." Leyse acknowledges that the Supreme Court, in *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407 (1942), held that FCC regulations may be "orders" within the meaning of § 402(a). He argues, however, that under *Columbia Broadcasting*, a regulation is only an "order" to the extent that it has "force of law." *See Columbia Broad.*, 316 U.S. at 417 ("Such regulations which affect or determine rights generally even though not directed to any particular person or corporation, when lawfully promulgated . . . have the force of law and are orders . . . .").[5] Mirroring his argument on *Chevron* deference, Leyse argues that the FCC's 2003 rule was only an

---

[5]"Generally, administrative orders are final and appealable if they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Multistar Indus., Inc. v. Dept. of Transp.*, 707 F.3d 1045, 1052 (9th Cir. 2013) (internal quotation marks omitted) (discussing Hobbs Act jurisdiction to review "final orders" of the Department of Transportation).

interpretive rule—not a regulation—and did not have the force of law. But as we explained above, there is little question that Congress intended FCC rules of the type at issue here to have force of law. Thus, for the reasons articulated for giving the rule deference under *Chevron*, we would find it to be an "order" governed by the Hobbs Act pursuant to *Columbia Broadcasting*.[6]

Leyse's final argument is that his TCPA lawsuit is not "a proceeding to enjoin, set aside, annul, or suspend" an order of the Commission, and therefore is not barred by the Hobbs Act under our decision in *United States v. Any and All Radio Station Transmission Equipment*, 204 F.3d 658 (6th Cir. 2000) ("*Maquina Musical*").[7] For the following reasons, however, *Maquina Musical* presents a different case from the one at hand.

*Maquina Musical* involved a government action in district court that sought the forfeiture of broadcasting equipment used by the unlicensed microbroadcaster Maquina Musical. *Id.* at 663, 666–68. Under applicable law, the government could seize broadcasting equipment that was knowingly used to broadcast without a license. *Id.* at 666. Maquina Musical argued in defense that 47 C.F.R. § 73.512(c)—a FCC regulation that effectively barred new microbroadcasting licenses from being issued—"was an unconstitutional prior restraint on speech." *Id.* at 662, 666–67. But the district court held "that it lacked jurisdiction to entertain Maquina Musical's constitutional defenses because 28 U.S.C. § 2342 provides that the courts of appeals have exclusive jurisdiction 'to enjoin,

---

[6]Acknowledging the synchronicity between the *Chevron* analysis and this element of the Hobbs Act analysis does not put us in conflict with *CE Design*. In that case, the plaintiff did not argue on appeal that the FCC decision at issue was "anything other than a final FCC order." 606 F.3d at 448 n.4.

[7]Our precedent refers to this as the *Strawcutter* case after Strawcutter, a party in the case. But the analysis in that case most relevant to the present case occurs in the section involving the situation of Maquina Musical, another party to that case. Moreover, the parties refer to the case as *Maquina Musical*. We therefore do the same.

set aside, suspend . . . or to determine the validity of . . . all final orders of the [FCC].'" *Id.* at 667 (alterations in original). This court disagreed with that holding and expressed concern that such interpretation of the statutory scheme would allow the government to seize Maquina Musical's property while simultaneously denying Maquina Musical the ability to contest the "legal basis of the government's forfeiture case." *Id.*

Since then, however, we have been hesitant to allow district courts to consider claims that implicate the validity of an FCC action, as illustrated by the next Sixth Circuit case to address this question, *La Voz Radio De La Communidad v. FCC*, 223 F.3d 313 (6th Cir. 2000). *La Voz* also involved an unlicensed microbroadcaster, but this time, the microbroadcaster (La Voz) applied for a license and the FCC returned the application because it was "grossly deficient." *Id.* at 316. A few months later, La Voz filed a complaint against the FCC District Director, seeking to enjoin the government from preventing La Voz from broadcasting its message and from sanctioning La Voz either criminally or civilly. *Id.* at 317. La Voz also argued that the FCC's regulation barring the issuance of broadcast licenses to microbroadcasters was unconstitutional. *Id.* at 315–16, 318. The government moved to dismiss for lack of jurisdiction and the district court agreed. *Id.*

We upheld that determination on appeal, distinguishing the case from *Maquina Musical* and reasoning that La Voz's complaint was "essentially a claim for prospective relief against the FCC," which "disregard[ed] Congress's directive that review of the FCC's administrative actions should occur in the courts of appeals (and, in many cases, specifically in the District of Columbia Circuit)." *Id.* at 320. In both *La Voz* and *Maquina Musical*, the microbroadcasters argued that the FCC regulations barring the issuance of broadcast licenses to microbroadcasters were unconstitutional, but the district court had jurisdiction to consider that argument only in *Maquina Musical*. This is

so because *La Voz* was a collateral attack on the FCC's denial of La Voz's license, and *Maquina Musical* was a direct in rem forfeiture action that was found not to involve a challenge to an FCC order.

In *United States v. Szoka*, 260 F.3d 516 (6th Cir 2001), we reinforced the principles applied in *Maquina Musical* and *La Voz*. The FCC in that case obtained a valid cease-and-desist order against an unlicensed broadcaster. *Id.* at 520. In unsuccessfully resisting that order, Szoka argued that the "FCC regulations prohibiting the licensing of low-power radio stations violated the First Amendment." *Id.* Szoka then appealed that order to the District of Columbia Circuit as required by 47 U.S.C. § 402(b)(7). *Id.* But because he refused to stop broadcasting even after the FCC obtained the cease-and-desist order, the FCC filed an action in district court, successfully obtaining an injunction preventing him from broadcasting. *Id.* at 521. During that proceeding, the district court expressed skepticism about the FCC's ban on low-power broadcasting, but concluded that it lacked jurisdiction to consider these claims because the D.C. Circuit had exclusive jurisdiction to hear them in Szoka's appeal of the cease-and-desist order itself. *Id.*

> On appeal of the district court's injunction, Szoka argued that the
>
> district court erred when it refused to consider Szoka's constitutional defenses to the government's motion for an injunction. Szoka argued to the district court and continues to argue on appeal that the FCC's former ban on microradio broadcasters is unconstitutional because it violates the First Amendment. As a result, he claims that the FCC cannot seek an injunction enforcing its cease and desist order.

*Id.* at 525. We affirmed the judgment of the district court, holding that there was no jurisdiction in the injunction proceeding or the resulting appeal to consider Szoka's constitutionality arguments. *Id.* at 526–28.

The court's analysis is the most thorough and clear of the three Sixth Circuit cases on point

and is worth quoting at length:

> While the circumstances of this case differ from those of *La Voz*, the controlling legal principles do not. *La Voz* emphasized that when . . . the FCC institutes an in rem forfeiture action—and not an administrative action—against a microbroadcaster, the broadcaster can raise and the district court can consider constitutional defenses. However, if the FCC institutes administrative proceedings, such as the issuance of a cease and desist order, against a microbroadcaster, the microbroadcaster must pursue his constitutional claims through the means given by Congress, which is the administrative process undertaken by the FCC and its review in the D.C. Circuit. Just as the plaintiff in *La Voz* could not use a constitutional claim as a sword to launch a preemptive strike against the FCC, so too is Szoka unable to use his constitutional claim as a shield in defense against the FCC's motion for an injunction enforcing the cease and desist order. . . .
>
> This result allows Szoka to raise his constitutional defenses within the scheme contemplated by the Communications Act. In [*Maquina Musical*], no FCC order was issued against the unlicensed microbroadcaster. Instead, the FCC went directly to the district court and instituted an in rem forfeiture action against the broadcaster. The broadcaster had no other forum in which to present his constitutional defenses. In this case, however, an FCC order was issued against Szoka, mandating that he cease and desist from broadcasting without a license. Szoka had the opportunity to raise his constitutional defenses in the course of the administrative action undertaken by the FCC. The FCC considered all of Szoka's constitutional defenses and rejected them. Szoka can raise his constitutional defenses once more in his appeal of the cease and desist order to the D.C. Circuit. There was no need for the district court to address Szoka's constitutional arguments, because he was able to raise them in other proceedings.

*Id.* at 527–28.

We agree with Leyse that *Maquina Musical* demonstrates that there may be limits to the extent the Hobbs Act and other similar statutory restrictions on judicial review apply to some constitutional defenses. For example, it is not clear that the Hobbs Act's sixty-day limit on court-of-appeals jurisdiction applies to all *as-applied* arguments. *See State of Tex. v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985) ("When an agency applies a previously adopted rule in a particular case, the Hobbs Act sixty-day limit does not bar later judicial review of the substantive statutory authority for their enactment or of their applicability to a particular situation."); *see also NLRB Union v.*

*FLRA*, 834 F.2d 191, 195–96 (D.C. Cir. 1987) (suggesting that a regulation or rule may be challenged after the expiration of a statutory limitations period where the rule is blatantly unconstitutional or ultra vires); *Cellular Telecomm's & Internet Ass'n v. FCC*, 330 F.3d 502, 508 (D.C. Cir. 2003) (citing *NLRB Union*, 834 F.2d at 195–97). *Cf. Koretoff v. Vilsack*, 707 F.3d 394, 401 (D.C. Cir. 2013) (Williams, J., concurring) (suggesting, in the context of the administrative-waiver doctrine, that certain limits on judicial review of agency rules may be inappropriate for those individuals or entities "ill-represented by broad industry groups and unlikely to be adequately lawyered-up at the rulemaking stage").

But Leyse's TCPA claim is a far cry from *Maquina Musical,* raises none of the constitutional questions at issue in that case, and is not an as-applied challenge. Rather, Leyse's argument is a facial attack on the TCPA exemption, in which he argues that the rule is invalid or should be set aside because of procedural deficiencies in its promulgation. The claim is an attempt to re-hash the arguments made by Biggerstaff throughout the process of his petition and the subsequent rulemaking. Attacks such as these—on the "procedural genesis of administrative rules"—are exactly the kind of facial attacks on the validity of FCC orders that the Hobbs Act meant to confine. *See Florilli Corp. v. Pena*, 118 F.3d 1212, 1214 (8th Cir. 1997) (citing *JEM Broad. Co. v. FCC*, 22 F.3d 320, 324 (D.C. Cir. 1994)); *cf. NLRB Union*, 834 F.2d at 195 ("[T]his court has repeatedly distinguished indirect attacks on the substantive validity of regulations . . . from like attacks on their procedural lineage."); *Hire Order Ltd. v. Marianos,* 698 F.3d 168, 170 (4th Cir. 2012) (noting that Hobbs Act caselaw supporting the possibility of as-applied challenges after the expiration of a statutory limitations period did not support the possibility of a facial challenge).

Applying the principles from these cases to the present case yields the conclusion that the

district court did not have jurisdiction to consider Leyse's arguments that the FCC's exemption decision should be set aside because of procedural infirmities. His collateral attack on the procedural validity of the FCC's decision does not fall within *Maquina Musical*'s exception to the Hobbs Act.

The Supreme Court's decision in *FCC v. ITT World Commc'ns, Inc.,* 466 U.S. 463 (1984), supports this conclusion. In that case, ITT and other companies involved in providing overseas telecommunications filed a rulemaking petition seeking to prevent the FCC from negotiating with foreign governments in a series of meetings called the Consultative Process that sought to encourage competition in telecommunications services. *Id.* at 468. The petition claimed that such negotiations were beyond the FCC's authority. *Id.* After the FCC denied the petition, the companies appealed to the D. C. Circuit. *Id*. at 466. ITT then sued the FCC directly in federal district court, arguing that the FCC had no authority to negotiate at the Consultative Process and seeking to enjoin that practice. *Id* at 466–67. The district court dismissed that count as beyond its jurisdiction in accordance with the Hobbs Act, but the D.C. Circuit reversed. *Id.*

On appeal, the Supreme Court held that

[e]xclusive jurisdiction for review of final FCC orders, such as the FCC's denial of respondents' rulemaking petition, lies in the Court of Appeals. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). Litigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order. . . . In substance, the complaint filed in the District Court raised the same issues and sought to enforce the same restrictions upon agency conduct as did the petition for rulemaking that was denied by the FCC.

*Id.* at 468 (internal citations omitted). The Court also reasoned that the "gravamen of both the judicial complaint and the petition for rulemaking was to require the agency to conduct future sessions on the terms that ITT proposed." *Id.* at 468 n.5. So the Court held that the Hobbs Act

reached an action (ITT's lawsuit in federal court) that collaterally attacked an FCC order (the FCC's denial of the telecommunication companies' rulemaking petition). Our interpretation of § 2342 and § 402(a) as barring Leyse's argument in this case therefore fits comfortably within the parameters of *ITT World*.

*ITT World* also underscores that the Hobbs Act would not have barred Leyse from challenging the TCPA exemption by petitioning the FCC for a declaratory ruling under 47 C.F.R. § 1.2 or to initiate a new rulemaking under 47 C.F.R. § 1.401. The FCC's denial of such a petition would then be reviewable in the courts of appeals. *See ITT World*, 466 U.S. at 468 & n.5; *Cellular Telecomms.*, 330 F.3d at 508. By filing a request for a declaratory ruling, Leyse would become a "party aggrieved" within the definition of the Act, 28 U.S.C. § 2344, and would then have sixty days to seek judicial review. *But cf. Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 666 F.2d 595, 602–03 (D.C. Cir. 1981) (noting that a party who had the opportunity to seek direct review of a regulation cannot use a petition to repeal a regulation as a "back door procedural challenge[]" to challenge the procedures used to promulgate the original rule).

Leyse, however, did not follow the prescriptions of the Hobbs Act. Instead he filed the instant suit. And because he had already pursued litigation over the same phone call in the Second Circuit, he knew that Clear Channel's defense would depend on the FCC's exemption provision. Under these circumstances, the district court had jurisdiction to consider the scope of the exemption and whether the call fit within it. But, based on our precedent and in accordance with the analysis of *ITT World*, the Hobbs Act deprives the district court below—and this court on appeal—of jurisdiction over the argument that the exemption was invalid or should be set aside because of procedural concerns. *See CE Design*, 606 F.3d at 448 ("[T]he Hobbs Act's jurisdictional limitations

-24-

are equally applicable whether [a party] wants to challenge the rule directly . . . or indirectly, by suing someone who can be expected to set up the rule as a defense in the suit." (internal quotation marks omitted)).

## III. CONCLUSION

For the above reasons, we **AFFIRM** the judgment of the district court.