**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 16-2185

CARLTON & HARRIS CHIROPRACTIC, INC., a West Virginia Corporation, individually and as the representative of a class of similarly-situated persons,

Plaintiff − Appellant,

v.

PDR NETWORK, LLC; PDR DISTRIBUTION, LLC; PDR EQUITY, LLC; JOHN DOES 1-10,

Defendants – Appellees.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:15-cv-14887)

Argued: October 25, 2017                    Decided: February 23, 2018

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

Vacated and remanded by published opinion. Judge Diaz wrote the majority opinion, in which Judge Harris joined. Judge Thacker wrote a dissenting opinion.

**ARGUED:** Glenn Lorne Hara, ANDERSON + WANCA, Rolling Meadows, Illinois, for Appellant. Jeffrey N. Rosenthal, BLANK ROME LLP, Philadelphia, Pennsylvania, for Appellees. **ON BRIEF:** Brian J. Wanca, ANDERSON + WANCA, Rolling Meadows, Illinois; D. Christopher Hedges, David H. Carriger, THE CALWELL PRACTICE PLLC, Charleston, West Virginia, for Appellant. Ana Tagvoryan, BLANK ROME LLP, Los Angeles, California; Marc E. Williams, Robert L. Massie, NELSON, MULLINS, RILEY

& SCARBOROUGH LLP, Huntington, West Virginia, for Appellees.

DIAZ, Circuit Judge:

Carlton & Harris Chiropractic, Inc. appeals from the district court's dismissal of its claim against PDR Network, LLC, PDR Distribution, LLC, PDR Equity, LLC, and John Does 1-10 (collectively, "PDR Network") for sending an unsolicited advertisement by fax in violation of the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227. Carlton & Harris argues that the district court erred in declining to defer to a 2006 Rule promulgated by the Federal Communications Commission (the "FCC") interpreting certain provisions of the TCPA. Specifically, Carlton & Harris contends that the Hobbs Act, 28 U.S.C. § 2342 *et seq.*, required the district court to defer to the FCC's interpretation of the term "unsolicited advertisement." Additionally, to the extent that the district court interpreted the meaning of the 2006 FCC Rule, Carlton & Harris argues that the district court erred by reading the rule to require that a fax have some commercial aim to be considered an advertisement.

Because the Hobbs Act deprives district courts of jurisdiction to consider the validity of orders like the 2006 FCC Rule, and because the district court's reading of the 2006 FCC Rule is at odds with the plain meaning of its text, we vacate the district court's judgment.

I.

We review a district court's dismissal under Fed. R. Civ. P. 12(b)(6) de novo, "assuming as true the complaint's factual allegations and construing all reasonable

3

inferences in favor of the plaintiff." *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017) (internal quotation marks omitted).

A.

Carlton & Harris maintains a chiropractic office in West Virginia. PDR Network is a company that "delivers health knowledge products and services" to healthcare providers. J.A. 33. Among other things, PDR Network publishes the *Physicians' Desk Reference*, a widely-used compendium of prescribing information for various prescription drugs. PDR Network is paid by pharmaceutical manufacturers for including their drugs in the *Physicians' Desk Reference*.

On December 17, 2013, PDR Network sent Carlton & Harris a fax. The fax was addressed to "Practice Manager" and its subject line announced: "FREE 2014 *Physicians' Desk Reference* eBook — Reserve Now." J.A. 23. The fax invited the recipient to "Reserve Your Free 2014 *Physicians' Desk Reference* eBook" by visiting PDR Network's website. *Id.* It included a contact email address and phone number. The fax touted various benefits of the e-book, noting that it contained the "[s]ame trusted, FDA-approved full prescribing information . . . [n]ow in a new, convenient digital format" and that the e-book was "[d]eveloped to support your changing digital workflow." *Id.* At the bottom of the fax, a disclaimer provided a phone number the recipient could call to "opt-out of delivery of clinically relevant information about healthcare products and services from PDR via fax." *Id.* Finally, the fax advised that Carlton & Harris had received the offer "because you are a member of the PDR Network." *Id.*

4

B.

Carlton & Harris sued PDR Network in the Southern District of West Virginia, asserting a claim under the TCPA. The TCPA, as amended by the Junk Fax Prevention Act of 2005, Pub. L. No. 109-21, 119 Stat. 359, generally prohibits the use of a fax machine to send "unsolicited advertisement[s]." 47 U.S.C. § 227(b)(1)(C). It creates a private cause of action that permits the recipient of an unsolicited fax advertisement to seek damages from the sender and recover actual monetary loss or $500 in statutory damages for each violation. 47 U.S.C. § 227(b)(3). If a court finds that the sender "willfully or knowingly violated" the TCPA, damages may be trebled. *Id.* Carlton & Harris seeks to represent a class of similarly situated recipients of unsolicited faxes offering free copies of the *Physicians' Desk Reference* e-book.

PDR Network moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim. It argued that the fax offering the free e-book could not be considered an unsolicited advertisement as a matter of law because it did not offer anything for sale. In response, Carlton & Harris pointed to a 2006 FCC Rule interpreting the term "unsolicited advertisement." Pursuant to its statutory authority to "prescribe regulations to implement the requirements" of the TCPA, *see* 47 U.S.C. § 227(b)(2), the FCC promulgated a rule providing that "facsimile messages that promote goods or services even at no cost . . . are unsolicited advertisements under the TCPA's definition." *See* Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25,967, 25,973 (May 3, 2006) (the "2006 FCC Rule"). Carlton & Harris argued that the fax it received was an unsolicited advertisement as defined in the 2006

5

FCC Rule because it promoted a good at no cost. Moreover, Carlton & Harris argued that the district court was obligated to follow the 2006 FCC Rule pursuant to the Hobbs Act.

The district court disagreed. The court held that the Hobbs Act did not compel the court to defer to "the FCC's interpretation of an unambiguous statute." *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, No. 3:15-14887, 2016 WL 5799301, at \*4 (S.D. W. Va. Sept. 30, 2016). The district court considered the TCPA's own definition of "unsolicited advertisement" "clear and easy to apply," and thus held that it was not required to follow the 2006 FCC Rule and "decline[d] to defer" to it. *Id.* (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). The district court further held that even under the 2006 FCC Rule, PDR Network's fax was still not an advertisement because the rule requires an advertisement to have a "commercial aim," and no such aim existed here. *Id.* Accordingly, the district court concluded that Carlton & Harris had not stated a valid claim under the TCPA and granted PDR Network's motion to dismiss. *Id.* This appeal followed.

II.

The question presented is whether and when a fax that offers a free good or service constitutes an advertisement under the TCPA. To resolve it, we must answer two more: first, must a district court defer to an FCC interpretation of the TCPA? And if so, what is the meaning of "unsolicited advertisement" under the 2006 FCC Rule? We address these issues in turn.

6

A.

The TCPA defines "unsolicited advertisement" to include "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). In a typical case of statutory interpretation where an agency rule is involved, the familiar *Chevron* framework requires a court to first ask whether the underlying statute is ambiguous ("step one"). *See Chevron*, 467 U.S. at 843; *Montgomery Cty., Md. v. F.C.C.*, 811 F.3d 121, 129 (4th Cir. 2015). Where a statute's meaning is clear on its face, the inquiry ends and the unambiguous meaning controls. *Chevron*, 467 U.S. at 842–43.

In this case, the district court applied step one of *Chevron* to the TCPA's definition and found it to be unambiguous. Thus, it declined to defer to the FCC interpretation. We conclude, however, that the Hobbs Act, 28 U.S.C. § 2341 *et seq.*, precluded the district court from even reaching the step-one question.

The Hobbs Act, also known as the Administrative Orders Review Act, provides a mechanism for judicial review of certain administrative orders, including "all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1).[1] A party aggrieved by such an order may challenge it by

---

[1] 47 U.S.C. § 402(a) sets forth the procedure to "enjoin, set aside, annul, or suspend any order of the Commission under" the Communications Act, which includes the Telephone Consumer Protection Act. *See* Pub. L. No. 102-243, 105 Stat 2394. Neither party has disputed that the 2006 FCC Rule is the sort of "final order" contemplated by the Hobbs Act.

filing a petition in the court of appeals for the judicial circuit where the petitioner resides or has its principal office, or in the Court of Appeals for the D.C. Circuit. 28 U.S.C. § 2343. The Hobbs Act specifically vests the federal courts of appeals with "exclusive jurisdiction" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the orders to which it applies, including FCC interpretations of the TCPA. *See* 28 U.S.C. § 2342. "This procedural path created by the command of Congress promotes judicial efficiency, vests an appellate panel rather than a single district judge with the power of agency review, and allows uniform, nationwide interpretation of the federal statute by the centralized expert agency" charged with overseeing the TCPA. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014) (internal quotation marks omitted).

The district court erred when it eschewed the Hobbs Act's command in favor of *Chevron* analysis to decide whether to adopt the 2006 FCC Rule. Federal district courts are courts of limited jurisdiction and "possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005) (internal quotation marks omitted); U.S. Const. art. III, § 1. Where, as here, Congress has specifically stripped jurisdiction from the district courts regarding a certain issue, those courts lack the power and authority to reach it.

This sort of "jurisdiction-channeling" provision, especially in the context of administrative law, is "nothing unique." *Blitz v. Napolitano*, 700 F.3d 733, 742 (4th Cir. 2012) (noting that "agency decisions are commonly subject to such" provisions and that "final agency actions are generally reviewed in the courts of appeals"). When *Chevron*

8

meets Hobbs, consideration of the merits must yield to jurisdictional constraints. "[A]n Article III court's obligation to ensure its jurisdiction to resolve a controversy precedes any analysis of the merits . . . [A]rguing that the district court can put off considering its jurisdiction until after step one of *Chevron* . . . turns that traditional approach on its head." *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 447–48 (7th Cir. 2010). Indeed, a district court simply cannot reach the *Chevron* question without "rubbing up against the Hobbs Act's jurisdictional bar." *Id.* at 449. The district court had no power to decide whether the FCC rule was entitled to deference. By refusing to defer to the FCC rule and applying *Chevron* analysis instead, the court acted beyond the scope of its congressionally granted authority.

Every other circuit to consider the issue has reached the same result. In *Mais v. Gulf Coast Collection Bureau, Inc.*, the Eleventh Circuit reversed a district court finding that an FCC interpretation of the TCPA's "prior express consent" exception was inconsistent with the statute. 768 F.3d at 1113. The court held that because of the Hobbs Act, the district court "lacked the power to consider in any way the validity of the 2008 FCC Ruling." *Id.* The Eighth Circuit, in *Nack v. Walburg*, refused to consider whether an FCC interpretation of the TCPA "properly could have been promulgated" because the Hobbs Act "precludes us from entertaining challenges to the regulation." 715 F.3d 680, 682 (8th Cir. 2013). And in *Leyse v. Clear Channel Broad., Inc.*, the Sixth Circuit held that the Hobbs Act "deprives the district court below—and this court on appeal—of jurisdiction over the argument that the exemption [to the TCPA] was invalid or should be set aside because of procedural concerns." 545 F. App'x 444, 459 (6th Cir. 2013)

9

(unpublished) (amending and superseding *Leyse v. Clear Channel Broad. Inc.*, 397 F.3d 360 (6th Cir. 2012)).

PDR Network urges us to instead follow the Sixth Circuit's decision in *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, which also considered the meaning of "advertisement" under the TCPA. 788 F.3d 218 (6th Cir. 2015). But although *Sandusky* declined to defer to the 2006 FCC Rule because it found the statutory definition unambiguous, that decision made no mention of the Hobbs Act's jurisdictional bar nor explained how the court overcame it. *See id.* at 223. For that reason, we do not find that decision persuasive here.

B.

PDR Network also argues (and our dissenting colleague agrees) that the Hobbs Act should not apply in this case because the district court did not specifically invalidate the 2006 FCC Rule. Instead, PDR Network contends, the court merely chose not to apply it. *See Carlton & Harris*, 2016 WL 5799301, at *3 ("[T]he Court presumes the FCC's order is valid. Nonetheless, the order's validity does not, *ipso facto*, bind the Court to defer to the FCC's interpretation of the TCPA.").

We find this logic unavailing. The Hobbs Act broadly vests federal appellate courts with exclusive jurisdiction to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" orders like the 2006 FCC Rule. 28 U.S.C. § 2342(1). District courts, by implication, are without jurisdiction to do any of those things. As other courts have recognized, to decide whether the Hobbs Act applies to restrict jurisdiction in a particular case, we look to the "practical effect" of a claim. *See Mais*, 768 F.3d at 1120.

It is of no moment whether PDR Network specifically asked the district court to find the rule invalid, or whether the court purported to do so. *See CE Design*, 606 F.3d at 448 ("[R]equest[ing] that the court 'ignore' the rule is just another way of asking it *not* to enforce the rule."). Like the Seventh Circuit, we see no difference in "this fine distinction." *Id.*

Invalidation by any other name still runs afoul of the Hobbs Act's constraints. To hold that a district court cannot enjoin or set aside a rule but is nevertheless free to ignore it (or "decline[] to defer" to it, *Carlton & Harris*, 2016 WL 5799301, at *4) would allow a party to perform an end run around the administrative process Congress created and instead tackle administrative orders in a district court. Such an approach is contrary to the text of the Hobbs Act, and would undermine Congress's aim of ensuring uniform application of FCC orders. If PDR Network is bent on challenging the validity or prudence of the FCC rule, it must do so through the specific administrative procedure that the Hobbs Act provides.

For these reasons, we hold that the jurisdictional command of the Hobbs Act requires a district court to apply FCC interpretations of the TCPA. The district court therefore erred by engaging in *Chevron* analysis and "declin[ing] to defer" to the FCC rule.

C.

Although the Hobbs Act prevents the district court (and this court on appeal) from questioning the validity of the 2006 FCC Rule, the court can, and must, interpret what it says. *See Cartrette v. Time Warner Cable, Inc.*, 157 F. Supp. 3d 448, 452–53 (E.D.N.C.

11

2016) ("[T]he matters of interpreting and applying the FCC's rulings remain within the province of the court."). We therefore consider whether the district court erred in determining that the 2006 FCC Rule requires a fax to have some commercial aim to be considered an "advertisement" for purposes of TCPA liability.

"[O]ur interpretation of regulations begins with their text." *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012). The 2006 FCC Rule provides, in pertinent part:

> [Facsimile] messages that promote goods or services even at no cost, such as free magazine subscriptions, catalogs, or free consultations or seminars, are unsolicited advertisements under the TCPA's definition. In many instances, "free" seminars serve as a pretext to advertise commercial products and services. Similarly, "free" publications are often part of an overall marketing campaign to sell property, goods, or services. For instance, while the publication itself may be offered at no cost to the facsimile recipient, the products promoted within the publication are often commercially available. Based on this, it is reasonable to presume that such messages describe the "quality of any property, goods, or services." Therefore, facsimile communications regarding such free goods and services, if not purely "transactional," would require the sender to obtain the recipient's permission beforehand, in the absence of an EBR [established business relationship].

The rule also distinguishes messages promoting free goods or services, which are unsolicited advertisements, from communications "that contain only information, such as industry news articles, legislative updates, or employee benefit information," which are not. *Id.*; *see also Sandusky*, 788 F.3d at 223–24.

The district court concluded that even under the 2006 FCC Rule, PDR Network's fax was not an advertisement because the rule includes only faxes with a "commercial aim." *Carlton & Harris*, 2016 WL 5799301, at *5. The district court attempted to

12

"harmonize[] the FCC interpretation with the plain meaning of the TCPA" and concluded that a "blanket ban on any fax that offers a free good or service without any commercial aspect either directly or indirectly obviates the eminently rational purpose to the FCC's guidance and strips essential meaning from the TCPA." *Id.* at *4.

We disagree. There is no need to "harmonize" a rule whose meaning is plain. And the district court's interpretation doesn't follow from the rule's plain text. A close reading of the rule reveals a different result. The first sentence of the relevant portion is clear and unambiguous. Setting aside the list of examples (which, set off by the words "such as," is meant to illustrate rather than exhaust), it reads: "[F]acsimile messages that promote goods or services even at no cost . . . are unsolicited advertisements under the TCPA's definition." 2006 FCC Rule. The sentences that follow explain the rationale for that straightforward principle. Offers that are purportedly "free" often have commercial strings attached, either as pretext or as part of an overall marketing campaign.[2] For this reason, the FCC chose to interpret the term "advertisement" broadly to include any offer of a free good or service.

"The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *Gilbert*, 678 F.3d at 276 (quoting *Textron, Inc. v. Comm'r*, 336 F.3d 26, 31 (1st

---

[2] Contrary to our colleague's view, we are not here "attempt[ing] to divine the FCC's intent," *post* at 27 n.2, but simply paraphrasing the text of the FCC Rule.

Cir. 2003)).  From a natural reading of the text of the regulation, we get this simple rule: faxes that offer free goods and services are advertisements under the TCPA.  We need not "harmonize" the FCC's rule with the underlying statute, or probe the agency's rationale.  Because the plain meaning of the regulation is clear, our interpretive task is complete.

Judge Pierre Leval recently reached a similar conclusion in his concurring opinion in *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92 (2d Cir. 2017).  In that case, Boehringer sent an unsolicited fax to physicians inviting them to a free dinner meeting to discuss certain medical disorders.  *Id.* at 93.  At the time, Boehringer did not sell any drugs that treated those disorders, but was in the process of developing one and had submitted preliminary documents to the FDA for approval.  *Id.* at 94.

The district court dismissed the case, holding that the fax was not an advertisement as a matter of law.  *See id.* at 93.  While the Second Circuit reversed on the basis of the 2006 FCC Rule, it did so recognizing the difficulty of proving a commercial nexus at the pleading stage, and held that the case should advance to discovery to determine whether the meeting in fact had a commercial purpose.  *See id.* at 96–97.

But in his concurrence, Judge Leval explained that by reading the 2006 FCC Rule "precisely, sentence by sentence, giving each sentence its natural meaning," a different interpretation emerged requiring no commercial nexus at all.  *See id.* at 100–01 (Leval, J., concurring).  Specifically, "[b]ecause of the frequency, observed by the [FCC], that messages offering free goods or services in fact mask or precede efforts to sell

14

something, the Commission has adopted a prophylactic presumption that fax messages offering free goods or services *are* advertisements and thus *are* prohibited by § 277." *Id.*

We find Judge Leval's logic persuasive and agree that his is the natural and logical reading of the 2006 FCC Rule.[3] The rule may be overinclusive in that (for example) it may bar an organization from faxing offers for truly free goods and services unconnected to any commercial interest, but prophylactic rules are neither uncommon nor unlawful. *See Friedman v. Heckler*, 765 F.2d 383, 388 (2d Cir. 1985) ("Prophylactic rules . . . cannot, and need not, operate with mathematical precision . . . The mere fact that a regulation operates overbroadly does not render it invalid.").

In any event, given the increasing obsolescence of fax machines, we suspect there will be few occasions where this rule serves to block an entity wishing to offer truly free goods or services from doing so.[4] And although we do not reach the FCC's intent in enacting the rule, its decision to prohibit all unsolicited offers for free goods or services is (in our view) a reasonable one. A per se rule advances the purpose of the underlying statute by protecting consumers from junk faxes. The rule also helps would-be violators

___

[3] Our dissenting colleague suggests that we have omitted something from our analysis of *Boehringer*. *See post* at 22 n.1. But we cite the case only to note our agreement with Judge Leval's reading of the FCC Rule.

[4] In his concurrence in *Boehringer*, Judge Leval addressed the concern that his interpretation of the rule would prevent "charitable, nonprofit entities" from sending offers for free goods or services. *See* 847 F.3d at 102–03 (Leval, J., concurring). He noted several reasons why charities or nonprofits might be exempt from liability under the rule. Because there is nothing in the record to suggest PDR Network is such an entity, we need not and do not decide that question here.

15

avoid inadvertent liability by eliminating the need for a case-by-case determination of whether a fax is indeed a free offer, or merely a pretext for something more.

The district court expressed concern that this interpretation of the 2006 FCC Rule would undermine the text and purpose of the TCPA, which "seeks to curtail faxes with a commercial nature." *Carlton & Harris*, 2016 WL 5799301, at \*4. Relying on the meaning of the words "commercial" and "promote," the court reasoned that the rule cannot mean that all faxes offering free goods and services are advertisements, because that would "read 'commercial' out of the TCPA's definition of 'unsolicited advertisement'—a clear abdication of elementary statutory construction." *Id.* The district court is correct that Congress enacted the TCPA to combat an "explosive growth in unsolicited facsimile advertising, or 'junk fax.'" *See* H.R. Rep. 102–317. But requiring a fax to propose a specific commercial transaction on its face takes too narrow a view of the concepts of commercial activity and promotion, and ignores the reality of many modern business models.

This case illustrates why the FCC may have decided to implement so broad a rule. At this point in the litigation, Carlton & Harris has not taken any discovery, and few details of PDR Network's business model have emerged. We do know that PDR Network receives money from pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*. And nothing in the record suggests that PDR Network is a charity that distributes free e-books without hope of financial gain. Although PDR Network does not charge healthcare providers money for its e-book, it's certainly plausible that the amount of money it receives turns on how many copies of the

*Physicians' Desk Reference* it distributes.  The free distribution of the e-book, then, may not impose a financial cost on healthcare providers, but PDR Network may nevertheless stand to profit when a provider accepts a free copy.

Moreover, giving away products in the hope of future financial gain is a commonplace marketing tactic.  PDR Network purports to offer other services to healthcare providers, and it may offer the *Physicians' Desk Reference* for free in the hopes of establishing relationships with healthcare providers that will lead to future sales of other goods or services.  All told, we think it entirely plausible that PDR Network distributes the free e-books to further its own economic interests.

Our musings aside, the FCC through its Congressional mandate to administer and implement the TCPA has declined to require such a fact-based inquiry.  PDR Network sent Carlton & Harris a fax that offered a free good, namely, the *Physicians' Desk Reference* e-book. [5]  Accordingly, the fax was an advertisement under the plain meaning of the 2006 FCC Rule.

---

[5] The primary cases on which PDR Network relies involve informational faxes rather than offers of free goods or services.  *See Sandusky*, 788 F.3d at 220 (fax containing formulary information for prescription drugs); *Physicians Healthsource, Inc. v. Janssen Pharm., Inc.*, No. 12-2132, 2013 WL 486207, at *1 (D.N.J. Feb. 6, 2013) (fax containing information about reclassification of prescription drug for insurance purposes).  The 2006 FCC Rule expressly states that informational faxes are not unsolicited advertisements.

## III.

To sum up, this case asks us to determine the meaning of the word "advertisement." In doing so, we do not start with a blank slate. Instead, we must follow the guideposts that Congress has set out. The Hobbs Act tells us where to look for an answer: the 2006 FCC Rule. And that rule, in turn, tells us what "advertisement" means.

The Hobbs Act requires a district court to follow FCC interpretations of the TCPA, and under the 2006 FCC Rule, PDR Network's fax offering a free good was indeed an advertisement. PDR Network may think the FCC Rule unwise or unfair, but the district court was "without jurisdiction to consider [its] wisdom and efficacy." *Mais*, 768 F.3d at 1121.

For these reasons, we vacate the district court's judgment and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

THACKER, Circuit Judge, dissenting:

Because I believe that (1) the district court did not exceed its jurisdiction under the Hobbs Act and (2) the 2006 FCC Rule requires a commercial aim, which is not present here, I respectfully dissent.

## I.

### Hobbs Act Jurisdiction

Carlton & Harris ("Appellant") argues that the district court exceeded its jurisdiction under the Hobbs Act. Appellant asserts that the Hobbs Act precludes any *Chevron* analysis and requires district courts to simply defer to -- or adopt -- FCC guidance. *See Chevron, U.S., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–44 (1984). Therefore, Appellant contends, and the majority agrees, that by engaging in a *Chevron* analysis, the district court inappropriately determined the validity of the 2006 FCC Rule. I disagree. In my view, the district court did not actually determine the validity of the 2006 FCC Rule. Therefore, the district court did not exceed its jurisdiction.

### A.

Under the Hobbs Act, the federal courts of appeals "ha[ve] exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC]." 28 U.S.C. § 2342. Accordingly, Congress entrusts district courts with the singular task of interpreting and enforcing FCC guidance when required. The *Chevron* doctrine, which governs judicial review of an agency's construction of a statute, provides a two step tool guiding when a district court must interpret and enforce

19

administrative authority. At step one of the *Chevron* analysis, the court determines whether the statute is ambiguous. *See* 467 U.S. at 842–43. If the statute is clear, "that is the end of the matter" and the court does not defer to the agency construction. *Id.* at 842. If the statute is ambiguous, the court moves to step two. *See id.* at 843. At step two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

The majority concludes that when a court decides that a statute is unambiguous at step one of the *Chevron* analysis and accordingly does not defer to the agency's construction at issue, it necessarily invalidates the agency's construction. Therefore, the majority's reasoning goes, in order to avoid violating the Hobbs Act by deciding the validity of FCC orders, which is the sole purview of the courts of appeal, district courts must simply defer to FCC guidance and cannot engage in any *Chevron* analysis at all. *See ante* at 7 ("We conclude . . . that the Hobbs Act . . . precluded the district court from even reaching the step-one question [of *Chevron*].").

I take issue with the majority's conclusion that the failure of the district court to defer to an agency's construction at step one of the *Chevron* analysis invalidates the agency's construction. Invalidation occurs at step one of *Chevron* only if a court finds that that the agency's construction is in conflict with the unambiguous statutory language. *See, e.g.*, *William v. Gonzales*, 499 F.3d 329, 333–34 (4th Cir. 2007) ("[W]e believe it is evident that [the regulation] . . . conflicts with the [unambiguous] statute . . . . Therefore, we conclude that this regulation lacks authority and is invalid."); *Foxglenn Inv'rs, Ltd. P'ship v. Cisneros*, 35 F.3d 947, 952 (4th Cir. 1994) (declaring invalid a regulation that

20

rendered a section of an unambiguous statute superfluous); *see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014) (recognizing that the district court invalidated an FCC regulation when it deemed it to be inconsistent with the clear meaning of the TCPA); *Nack v. Walburg*, 715 F.3d 680, 685–86 (8th Cir. 2013) (finding that the argument that an FCC regulation was contrary to the unambiguous language of the TCPA was a facial challenge).

Here, there was no such finding. The district court concluded that the TCPA was unambiguous and therefore did not need to defer to the 2006 FCC Rule. But in reaching that conclusion, the district court did not "determine the validity of" the 2006 FCC Rule. 28 U.S.C. § 2342. To the contrary, the court assumed the 2006 FCC Rule was valid and used it to bolster its interpretation of the TCPA. The district court concluded, "A plain reading of the TCPA and the [2006] FCC [Rule] demonstrates that they intend to curtail the transmission of faxes with a commercial aim." J.A. 135. Critically, the district court did not find the language of TCPA and the 2006 FCC Rule to be in conflict, and logically, by virtue of *using and interpreting* the 2006 FCC Rule, the district court could not have invalidated it. Accordingly, it did not exceed the Hobbs Act's jurisdictional bounds.

### B.

The majority points to three cases in support of its jurisdictional analysis: (1) *Nack v. Walburg*, 715 F.3d 680 (8th Cir. 2013); (2) *Leyse v. Clear Channel Broadcasting, Inc.*, 545 F. App'x 444 (6th Cir. 2013); and (3) *Mais v. Gulf Coast Collection Bureau, Inc.*,

21

768 F.3d 1110 (11th Cir. 2014).[1]  The majority posits that these cases demonstrate that "[e]very other circuit to consider the [jurisdictional] issue has reached the same result." *Ante* at 9.  But these cases are inapposite.

In both *Nack* and *Leyse*, the issue presented was a facial challenge to an FCC regulation.  In *Nack*, the defendant asserted an affirmative defense that the FCC regulation, as the basis of the plaintiff's action, was contrary to the unambiguous language of the TCPA.  *See* 715 F.3d at 685–86.  The Eighth Circuit construed this

---

[1] The majority also uses *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 847 F.3d 92 (2d Cir. 2017), to interpret the 2006 FCC Rule and adopts the concurring opinion in that case.  *See ante* at 14–16.  However, it fails to address a significant omission in *Boehringer.  See id.*

As a matter of background, the district court in *Boehringer* interpreted the 2006 FCC Rule to require a commercial aim.  *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms.*, Inc., No. 3:14-cv-405, 2015 WL 144728, at *3 (D. Conn. Jan. 12, 2015).  It found that this interpretation conformed with the TCPA's prohibition on the unsolicited sending of "material advertising the commercial availability or quality of any property, goods, or services" and the FCC's exclusion of "messages that do not promote a commercial product or service" from unsolicited advertisements.  *Id.* (internal quotation marks omitted).  There was no facial challenge to the 2006 FCC Rule, and the district court did not determine that the TCPA and the 2006 FCC Rule were in conflict.  The district court further held that Physicians Healthsource failed to plead specific facts to prove a commercial element and therefore dismissed the claim.  *See id.* at *5–*6.

On appeal to the Second Circuit, Physicians Healthsource argued in its opening brief that the district court violated the Hobbs Act because it "refused to apply the plain language of the [2006 FCC R]ule."  Appellant's Br. at 22, *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, No. 15-288 (2d Cir. Feb. 2, 2015; filed Mar. 27, 2015), ECF No. 27.  The Second Circuit did not address this argument and instead addressed the merits, determining that the 2006 FCC Rule required a commercial aim.  *See Boehringer*, 847 F.3d at 95–96.  The court ultimately vacated and remanded the case for discovery upon concluding that Physicians Healthsource successfully stated a claim for relief.  *See id.* at 96–97.

I see no difference between the district court's decision in *Boehringer* and the district court's decision here.  As in *Boehringer*, the district court here interpreted the 2006 FCC Rule in accordance with the TCPA to require a commercial aim.

argument as a challenge to the validity of the regulation. *See id.* Accordingly, the district court violated the Hobbs Act by considering it. *See id.* In *Leyse*, the plaintiff argued to the district court that the FCC rule was invalid or should be set aside because of procedural deficiencies in its promulgation. *Leyse*, 545 F. App'x at 458. On appeal, the plaintiff characterized his argument as an as-applied challenge and contended that the lawsuit was not "a proceeding to enjoin, set aside, annul, or suspend an order of the [FCC], and therefore was not barred by the Hobbs Act." *Id.* at 455 (internal quotation marks omitted). The Sixth Circuit determined that the plaintiff's attacks were "exactly the kind of facial attacks on the validity of FCC orders that the Hobbs Act meant to confine." *Id.* at 458. Accordingly, the Sixth Circuit concluded that the Hobbs Act deprived the district court of jurisdiction over the argument that the FCC regulation was invalid. *See id.* at 459.

In contrast, here there is no facial challenge to the 2006 FCC Rule. Appellant did not argue to the district court that the 2006 FCC Rule is contrary to the plain language of the TCPA. It also did not argue that the 2006 FCC Rule should be set aside due to procedural deficiencies. Appellant merely argued for a specific interpretation of the 2006 FCC Rule, and Appellee argued for a different interpretation.

*Mais* is also distinguishable. In *Mais,* the district court refused to afford any deference to the FCC rule because the rule conflicted with the clear meaning of the TCPA. *See Mais*, 768 F.3d at 1115. The Eleventh Circuit held that "the district court exceeded its jurisdiction by declaring the . . . FCC [r]uling to be inconsistent with the TCPA." *Id.* at 1119. The Eleventh Circuit determined that "[b]y refusing to enforce the

FCC's interpretation" because it was inconsistent with the TCPA, "the district court exceeded its power." *Id.* at 1119. Here, the district court did not find that the TCPA and the 2006 FCC Rule were in conflict. To the contrary, the district court assumed the 2006 FCC Rule was valid and harmonized the rule with its conclusions about the TCPA.

## II.

### *Chevron* Analysis

I now turn to whether an "unsolicited advertisement" under the TCPA must have a commercial aim. In doing so, I apply the familiar *Chevron* framework. *See Chevron, U.S., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–44 (1984). At step one, I conclude that the TCPA is ambiguous as to whether a fax must have a commercial aim to be an "advertisement." Accordingly, I would defer to the 2006 FCC Rule. At step two, I determine that in order for a fax to be an "advertisement," the 2006 FCC Rule requires that it have a commercial aim. Thus, I would affirm the district court.

### A.

At step one of the *Chevron* analysis, we must determine whether the TCPA's definition of "unsolicited advertisement" unambiguously requires faxes to have a commercial aim. Under the TCPA, a person may not "send, to a telephone facsimile machine, an unsolicited advertisement" unless certain notice requirements are met. 47 U.S.C. § 227(b)(1)(C). The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." *Id.* § 227(a)(5). Because (1) "advertis[ing]" does not definitely implicate a profit seeking

24

motive; and (2) "commercial" may or may not modify "quality," I conclude that the TCPA is ambiguous on this point.

When interpreting statutory language, we begin by giving the words of the statute their plain meaning. *See Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012). According to the New Oxford American Dictionary, "advertise" means to "describe or draw attention to . . . in a public medium in order to promote sales or attendance." *Advertise*, New Oxford American Dictionary (3d ed. 2010). But the word is also commonly understood to not necessarily implicate a profit seeking motive. The New Oxford American Dictionary further defines "advertise" as to "notify (someone) of something" and to "make (a quality or fact) known." *Id.* Additionally, while the New Oxford American Dictionary defines "commercial" as "making or intended to make a profit," the TCPA's definition of "unsolicited advertisement" is unclear as to whether "commercial" modifies "quality." *Commercial*, New Oxford American Dictionary (3d ed. 2010).

The plain language of the statute suggests two competing interpretations: one that requires a commercial aim and one that does not. It follows that a commercial aim *would not be* required if one accepts the common usage of "advertise" and believes "commercial" is divorced from "quality." Under this interpretation, a fax that simply points out the quality of a good would qualify as an unsolicited advertisement. But, it also follows that a commercial objective *would be* required if one accepts the "promote sales or attendance" definition of "advertise" and believes "commercial" modifies "quality." As a result, the TCPA is ambiguous.

25

B.

I thus move on to step two of the *Chevron* analysis. At step two, I conclude that the 2006 FCC Rule requires a commercial aim and is entitled to substantial deference because it is a "permissible" construction of the TCPA. *Chevron*, 467 U.S. at 843.

The majority determines that a "natural and logical reading" of the 2006 FCC Rule creates a prophylactic rule that all faxes offering free goods and services are "unsolicited advertisements" under the TCPA. *Ante* at 15. But in my view, the 2006 FCC Rule makes clear that even faxes that purport to have no commercial aim on their face must nonetheless have a commercial aim in order to be an "advertisement" under the TCPA.

The 2006 FCC Rule states:

> facsimile messages that promote goods or services even at no cost, such as free magazine subscriptions, catalogs, or free consultations or seminars, are unsolicited advertisements under the TCPA's definition. In many instances "free" publications are often part of an overall marketing campaign to sell property, goods, or services. For instance, while the publication itself may be offered at no cost to the facsimile recipient, the products promoted within the publication are often commercially available. Based on this, it is reasonable to presume that such messages describe the "quality of any property, goods, or services." Therefore, facsimile communications regarding such free goods and services, if not purely "transactional," would require the sender to obtain the recipient's permission beforehand, in the absence of an [established business relationship].

Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25,967, 25,973 (May 3, 2006).

26

As noted, in interpreting an agency's construction, we begin with the text.[2] *See Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012). A plain reading of the 2006 FCC Rule demonstrates that its objective is to prevent faxes with a commercial aim. Its objective is not to prevent faxes that promote free goods or services per se. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017). The 2006 FCC Rule explains that the "free" offering is "often part of an overall marketing campaign" and "the products promoted within the ['free'] publication are often commercially available." 71 Fed. Reg. at 25,973. In this way, the 2006 FCC Rule reflects the reality that "[b]usinesses are always eager to promote their wares and usually do not fund [publications, presentations, goods, or services] for no business purpose." *Boehringer*, 847 F.3d at 95.

In order to reach its conclusion, the majority reads the first sentence of the 2006 FCC Rule -- "[F]acsimile messages that promote goods or services even at no cost . . . are unsolicited advertisements under the TCPA's definition." -- in isolation. 71 Fed. Reg. at 25,973; *see ante* at 13 ("The first sentence of the relevant portion is clear and unambiguous."). To be sure, if read in a vacuum, the first sentence seems to create a prophylactic rule. However, it is informed by the language that follows.

---

[2] The majority's interpretation of the 2006 FCC Rule goes beyond the plain meaning of the text. The majority attempts to divine the FCC's intent when it states: "Offers that are purportedly 'free' often have commercial strings attached . . . . For this reason, the FCC chose to interpret the term 'advertisement' broadly to include any offer of a free good or service." *Ante* at 13.

Specifically, the second sentence of the 2006 FCC Rule redefines the subject faxes as those promoting free offerings with a commercial aim. It states, "In many instances 'free' publications are often part of an overall marketing campaign to sell property, goods, or services." 71 Fed. Reg. at 25,973. The 2006 FCC Rule then refers to "such messages" -- redefined as those with a commercial aim -- and explains, "[I]t is reasonable to presume that such messages describe the 'quality of any property, goods, or services.'" *Id.* Reading the 2006 FCC Rule as a whole, taking into account every sentence, reveals that a fax with a free offering must necessarily include a commercial aim to qualify as an "advertisement" under the TCPA.

This is a "permissible" construction. *Chevron*, 467 U.S. at 843. "A construction is permissible if it is reasonable . . . ." *Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 275 (4th Cir. 2008). This construction is certainly reasonable because it "is a logical interpretation and fits into one of two possible interpretations of the statute based on the plain meaning of the text." *Id.* at 276. Accordingly, this interpretation must be accepted.

III.

Pleading Standard

Having determined that the 2006 FCC Rule requires a commercial aim, I now turn to the relevant pleading standard. Because the TCPA is a remedial statute, it "should be liberally construed and . . . interpreted . . . in a manner tending to discourage attempted evasions by wrongdoers." *Scarborough v. Atl. Coast Line R. Co.*, 178 F.2d 253, 258 (4th Cir. 1949); *see Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013) ("The TCPA is a remedial statute that was passed to protect consumers . . . ."). "[R]equiring

28

plaintiffs to plead specific facts" showing a commercial aim "would impede the purposes of the TCPA" because plaintiffs will likely face difficulty in discerning whether a fax has a commercial aim. *See Boehringer*, 847 F.3d at 96. Indeed, the 2006 FCC Rule recognizes this fact by highlighting that "in many instances 'free' publications are often part of an overall marketing campaign to sell property, goods, or services." 71 Fed. Reg. at 25,973.

Accordingly, the burden at the pleading stage is minimal. "[W]here it is alleged that a firm sent an unsolicited fax promoting a free [publication containing products or services] that relate[] to the firm's [business], there is a plausible conclusion that the fax had the commercial purpose of promoting those products or services." *Boehringer*, 847 F.3d at 95. A plaintiff satisfies its burden at the pleading stage where facts are alleged that the publication's contents relate to the defendant's business. *See id.* at 96 ("There must be a commercial nexus to a firm's business, i.e., its property, products, or services; that, in our view, is satisfied at the pleading stage where facts are alleged that the subject of the free seminar relates to that business."). If the plaintiff meets this minimal burden, the defendant may rebut the inference, but only after discovery.

Here, Appellant has not met even this minimal burden. Appellant merely states in its complaint: "Each of the [Appellees] benefit or profit from the sale of the . . . [eBook]." J.A. 11 ¶ 12. This statement is contradicted by the fax itself, which demonstrates that the eBook is not offered for sale. *See id.* at 23 ("FREE 2014 *Physicians' Desk Reference* eBook -- Reserve Now"). Appellant does not even hint that the contents of the eBook relate to Appellees' business. Thus, Appellant has failed to state a claim.

## IV.

For the foregoing reasons, I would affirm the district court, and I respectfully dissent.