RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0110p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SANDUSKY WELLNESS CENTER, LLC, an Ohio
limited liability company, individually and as the
representatives of a class of similarly situated
persons,

        *Plaintiff-Appellant,*

    *v.*

MEDCO HEALTH SOLUTIONS, INC.,

        *Defendant-Appellee.*

No. 14-4201

───────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:14-cv-00583—James G. Carr, District Judge.

Decided and Filed: June 3, 2015

Before: McKEAGUE and DONALD, Circuit Judges; and MATTICE, District Judge.[*]

───────────────

## COUNSEL

**ON BRIEF:** David M. Oppenheim, Glenn L. Hara, ANDERSON + WANCA, Rolling
Meadows, Illinois, Matthew E. Stubbs, MONTGOMERY RENNIE & JONSON, Cincinnati,
Ohio, for Appellant. JoAnn T. Sandifer, Christopher A. Smith, HUSCH BLACKWELL LLP, St.
Louis, Missouri, Robert C. Tucker, ROBISON, CURPHEY & O'CONNELL, Toledo, Ohio, for
Appellee.

─────────

[*]The Honorable Harry S. Mattice, Jr., United States District Judge for the Eastern District of Tennessee,
sitting by designation.

1

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  It's under attack, but the fax lives on—in homes, offices, and, yes, judges' chambers around the country.  Christopher Null, *Why the fax still lives (and how to kill it)*, PCWORLD (Jan. 13, 2014 3:00 AM), http://bit.ly/1aWT21E.  And it lives on in this case.  A pharmacy benefit manager sent two faxes to a chiropractic company, listing medications available in the health plans of the chiropractors' patients.  Innocent enough, right? Well, no, actually, if those faxes were "unsolicited advertisements" prohibited by the Telephone Consumer Protection Act.  47 U.S.C. § 227(b)(1)(C).  That's the question presented in this case: Were those faxes "advertisements"?  No, we hold, because they lacked the necessary commercial aspects of ads.  And so we affirm the grant of summary judgment to the defendants.

I

As a pharmacy benefit manager, Medco Health Solutions acts as an intermediary between health plan sponsors (often employers) and prescription drug companies.  *See* Thomas Gryta, *What is a 'Pharmacy Benefit Manager?'*, WALL ST. J. (July 21, 2011 6:03 PM), http://on.wsj.com/1AgCGDe.  Medco provides services to plan sponsors that enable the plans to offer more informed and less expensive prescription drug benefits to their members (often employees).  Those services include keeping and updating a list of medicines (known as the "formulary") that are available through a healthcare plan.  Medco sends that list to the plan sponsors so they can offer the most attractive prescription drug plans to their members.

In addition to sending the formulary to its clients, Medco sends it to healthcare providers that prescribe medications to its clients' members.  R. 21-2 (Medco's Statement of Undisputed Facts) at ¶ 2; *see* Fed. R. Civ. P. 56(e)(2) (allowing the court to treat these facts as "undisputed for purposes of [Medco's summary-judgment] motion").  That way, the healthcare providers will know which medications are covered by their patients' healthcare plans.  Sandusky Wellness Center is one such healthcare provider.  R. 21-2 at ¶ 2.  It provides chiropractic services—and prescribes medications—to patients who are members of prescription drug plans contracted with

Medco.  R. 21-4 (Amy Green Decl.) at ¶ 4.  Its patients use their healthcare plans—and thus indirectly use Medco's services—to obtain the medications from Sandusky.

Medco faxed part of its formulary to Sandusky in June 2010.  That fax, entitled "Formulary Notification" and attached in Appendix A, informed Sandusky that "[t]he health plans of many of your patients have adopted" Medco's formulary.  R. 1-1 at 2.  The fax asked Sandusky to "consider prescribing plan-preferred drugs" to "help lower medication costs for [Sandusky's] patients," and it listed some of those drugs.  *Id.*  It also told Sandusky where it could find a complete list of the formulary.  Other than listing Medco's name and number, the fax did not promote Medco's services and did not solicit business from Sandusky.  *See id.*; *see also* R. 21-2 at ¶¶ 6–8.

Three months later, Medco sent another fax to Sandusky.  This second fax, entitled "Formulary Update" and attached in Appendix B, informed Sandusky that a certain respiratory drug brand was preferred over another brand, and that using the preferred brand could save patients money.  R. 1-1 at 3.  Neither this fax nor the first one contained pricing, ordering, or other sales information.  R. 21-2 at ¶¶ 6–7.  Nor did either fax ask Sandusky, directly or indirectly, to consider purchasing Medco's services.  *Id.* at ¶ 8.  The undisputed facts in the record instead show that each merely informed Sandusky which drugs its patients might prefer, irrespective of Medco's financial considerations.  *See* R. 21-2 at ¶¶ 5–8.

Nevertheless, Sandusky (individually and on behalf of a proposed class) sued Medco over these two faxes, claiming that they were "unsolicited advertisements" prohibited by the Telephone Consumer Protection Act.  Medco moved for summary judgment, arguing that the faxes were not advertisements as a matter of law because their primary purpose was informational rather than promotional.  The district court agreed.  R. 29 at 4–5.  It did not find the question close, calling it "not far off the mark, if off it at all here" that Sandusky's suit was "frivolous litigation."  *Id.* at 5 n.1.  It warned Sandusky and others like it "not to file similar fruitless litigation in the future" or else the court's "colleagues [would] respond appropriately." *Id.*

Sandusky and its attorneys did not heed that warning.  Not only did Sandusky appeal in this case, its attorneys have filed suits (and appeals after losing) in other courts as well.  *E.g.*,

*Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, No. 3:14-CV-405 SRU, 2015 WL 144728 (D. Conn. Jan. 12, 2015), *appeal filed* No. 15-288 (2d Cir. Feb 03, 2015); *see also* R. 21-1 (collecting faxes and cases from other Sandusky-related lawsuits). Yet Sandusky raises non-frivolous arguments on appeal. We freshly review those arguments to see if there is any genuine dispute of material fact and to determine whether Medco is entitled to judgment as a matter of law. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc).

## II

We begin with an overview of the Telephone Consumer Protection Act. Passed in response to "[v]oluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes"—the Act restricts certain kinds of telephonic and electronic solicitations. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012). At issue in this case is the Act's prohibition on sending unsolicited advertisements to fax machines. 47 U.S.C. § 227(b)(1)(C). The Act provides a $500 penalty for such a violation. § 227(b)(3)(B). Sandusky alleges that Medco violated the Act by sending two advertisements to its fax machine, but Medco responds that the faxes it sent were not "advertisement[s]" at all.

## A

So were these faxes advertisements? It is a question of law our court has never addressed. But the Act provides a definition. It defines "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." § 227(a)(5).

We can glean a few things from that definition. For one thing, we know the fax must *advertise* something. Advertising is "[t]he action of drawing the public's attention to something to promote its sale," Black's Law Dictionary 65 (10th ed. 2014), or "the action of calling something (as a commodity for sale, a service offered or desired) to the attention of the public," Webster's Third New International Dictionary 31 (1986). So material that advertises something promotes it to the public as *for sale*. For another thing, we know that what's advertised—here, the "availability or quality of any property, goods, or services"—must be *commercial* in nature. Commercial means "of, in, or relating to commerce"; "from the point of view of profit: having

profit as the primary aim." Webster's Third at 456. It's something that relates to "buying and selling." Black's Law Dictionary 270 (6th ed. 1990). So to be an ad, the fax must promote goods or services to be bought or sold, and it should have profit as an aim.

This refinement puts meat on the Act's bones: An advertisement is any material that promotes the sale (typically to the public) of any property, goods, or services available to be bought or sold so some entity can profit. *See* 47 U.S.C. § 227(a)(5); *see also* Black's Law Dictionary (10th ed.) at 65 (defining advertisement as a "commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers").

Everyday people recognize everyday ads as fitting within this definition. When McDonald's runs a television ad for a new McCafé item (complete with a jingle, of course), viewers understand that McDonald's is promoting that item to the public's attention, that it is available to be bought, and that McDonald's hopes to gain a profit from it. So too when a law firm buys space in a newspaper for its logo, slogan, areas of expertise, and contact information: Readers understand that the firm is soliciting the public to pay for its services (which are available for sale) with making money in mind. And probably so too when an orthopedic-implant manufacturer sends potential buyers a fax containing a picture of its product on an invitation to a free seminar: It is drawing the relevant market's attention to its product to promote its sale (albeit indirectly). *Cf. Physicians Healthsource, Inc. v. Stryker Sales Corp.*, No. 1:12-CV-0729, 2014 WL 7109630, at *5–*6 (W.D. Mich. Dec. 12, 2014); *see In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14097 (2003). *But see Phillip Long Dang, D.C., P.C. v. XLHealth Corp.*, 1:09-CV-1076-RWS, 2011 WL 553826, at *3–*4 (N.D. Ga. 2011). These are all (likely) ads under the Act's definition.

The same cannot be said of these two faxes. They call items (medications) and services (Medco's formulary) to Sandusky's attention, yes. But no record evidence shows that they do so because the drugs or Medco's services are for sale by Medco, now or in the future. In fact, the record shows that Medco has no interest whatsoever in soliciting business from Sandusky. R. 21-2 at ¶¶ 6–8. And no record evidence shows that the faxes promote the drugs or services in a commercial sense—they're not sent with hopes to make a profit, directly or indirectly, from Sandusky or the others similarly situated. *See id.* Nor does any record evidence show that

Medco hopes to attract clients or customers by sending the faxes. The record instead shows that the faxes list the drugs in a purely informational, non-pecuniary sense: to inform Sandusky what drugs its patients might prefer, based on Medco's formulary—a paid service already rendered not to Sandusky but to Medco's clients. *See id.* at ¶ 5; Appendices A & B. Under the Act's definition, and in everyday speak, these faxes are therefore not advertisements: They lack the commercial components inherent in ads.

Several on-point cases confirm this conclusion. The Ninth Circuit has held that because the item discussed in the fax was not "available to be bought or sold" or "for sale," it was not "commercially available" and thus not an ad under the Act. *N.B. Indus., Inc. v. Wells Fargo & Co.*, 465 F. App'x 640, 642 (9th Cir. 2012). Even more on point, other courts have held that an unsolicited fax from a pharmaceutical company about the reclassification of a drug—without any reference to how or where the drug was available for purchase—was not an ad under the Act. *Physicians Healthsource, Inc. v. Janssen Pharm., Inc.*, No. CIV.A. 12-2132 (FLW), 2013 WL 486207, at \*7 (D.N.J. Feb. 6, 2013); *see also Physicians HealthSource, Inc. v. MultiPlan Servs., Corp.*, No. CIV.A. 12-11693-GAO, 2013 WL 5299134, at \*2 (D. Mass. Sept. 18, 2013). And another has held that faxes from a preferred provider organization to non-participating healthcare providers are not ads when they don't promote the benefits of becoming a member or sell things to the recipient. *Long Dang*, 2011 WL 553826, at \*3–4. Just so here.

Our conclusion—that the Act unambiguously defines advertisements as having commercial components, and that these faxes lack those components—allows us to avoid wading into another dispute: determining the effect (if any) of the Federal Communications Commission's interpretation on this case. The statute charges the Commission with implementing the Act and gives it "the authority to promulgate binding legal rules." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–81 (2005). It has issued rules here. 47 C.F.R. § 64.1200(f)(1) (defining "advertisement"); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967, 25973 (May 3, 2006) (expounding on that definition). There is a circuit split on whether to defer to the Commission's explanation of its definition. *Compare N.B. Industries*, 465 F. App'x at 642–43 (giving *Chevron* deference to the Commission's

interpretation regarding incidental ads), *with Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 687–88 (7th Cir. 2013) (rejecting the Commission's interpretation regarding incidental ads). But where our "construction follows from the unambiguous terms of the statute"—as it does here—we do not defer to the agency's interpretation. *See Brand X*, 545 U.S. at 982.

In any event, reliance on the Commission's interpretation would only bolster our conclusion. According to the Commission's rules and regulations, faxes "that contain only information, such as industry news articles, legislative updates, or employee benefit information," are not advertisements under the Act. 71 Fed. Reg. at 25973. The Commission considers several factors to determine whether a fax is informational or promotional, and where the fax's "primary purpose is informational, rather than to promote commercial products," it is not covered by the Act. *Id.* That aptly describes the faxes here. They contain only information—parts of the formulary—and do not seek to promote products or services to make a profit. The faxes are analogous to the employee-benefit information discussed in the regulation. The district court, relying on the regulations, found this conclusion so obvious that it called Sandusky's suit borderline "frivolous litigation." R. 29 at 5 n.1. We wouldn't go that far, but we agree that the regulations, if we needed to rely on them, only help Medco's case that these faxes are not ads.

\* \* \*

The term "advertisement" unambiguously contains commercial components: To be an ad, the fax must promote goods or services that are for sale, and the sender must have profit as an aim. 47 U.S.C. § 227(a)(5); Black's Law Dictionary at 65; Webster's Third at 31. The record uniformly shows that these faxes lack those commercial aspects: They did not solicit business for a commercially available product or service. So they are not "advertisements" under the Act.

B

Sandusky counters with three arguments: (1) that the Act's definition is broader; (2) that we should follow the Seventh Circuit on the issue; and (3) that we should look outside of the four corners of the faxes to see that they're ads. None convinces.

*First*, Sandusky's proposed definition of "advertisement" sweeps much too broadly. The company says that anything that "makes known" the quality or availability of a good or service is an ad. Appellants' Br. 23, 27. Notice what's missing? It's the concept that an ad (at least an ad under the Act) is *commercial* in nature. The word "commercial" is in the Act's definition, § 227(a)(5), and the concept is part of the common understanding of what constitutes an ad, Black's Law Dictionary at 65. So "commercial" must play a role—*some* role. But Sandusky reads it out of the statute. We don't. The jury must be able to reasonably conclude that Medco sent the faxes "from the point of view of profit," to promote the availability or quality of something available to be bought or sold. Webster's Third at 456; *see* Black's Law Dictionary at 65. Based on these faxes and this record, it cannot do so here.

And no, we won't "broadly construe" the Act in Sandusky's favor because it is a so-called "remedial statute." Appellants' Br. 20–21; Reply Br. 3–4. As applied today, that canon is "either incomprehensible or superfluous." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 364–66 (2012). Why interpret a statute's language broadly or narrowly (as opposed to just reasonably or fairly)? And since all statutes remedy what's seen as a problem, which statutes do *not* deserve a broad construction? *Id.* at 364. In any event, insofar as our case law requires the canon's application at all, it doesn't require it when the statute's language is plain, *In re Carter*, 553 F.3d 979, 985–86 (6th Cir. 2009), as it is here. "The broad remedial goals of the [] Act" (assuming there are such goals) "are insufficient justification for interpreting a specific provision more broadly than its language and the statutory scheme reasonably permit." *Pinter v. Dahl*, 486 U.S. 622, 653 (1988) (internal quotation marks omitted). The language and statutory scheme of this Act do not reasonably permit an interpretation that makes these faxes "advertisements." And so they're not.

*Second*, the Seventh Circuit's decision in *Turza* does not contradict ours here. The person who sent the fax in *Turza* "plug[ged] the commercial availability of [his] services" by faxing his name, contact information, and areas of expertise (in addition to "mundane advice" about unrelated topics) to potential clients for "promotion[al] or marketing" reasons. *Turza*, 728 F.3d at 685–86, 688. The sender conceded that the fax was a "promotional" device, and his lawyer called it a "marketing" tool in his brief and at oral argument. *Id.* at 686–87. So the court

held as a matter of law that he faxed an advertisement. That conclusion is completely consistent with our judgment in this case. The faxes in *Turza* solicited business from the public, albeit in an indirect way. The faxes at issue here solicit nothing. They don't seek to make a profit, and they seek no actual or potential commercial transaction between the parties. They don't even seek a future *relationship* with Sandusky (forget a commercial one). In line with *Turza*, these are not ads.

*Third*, extraneous and speculative down-the-stream evidence cannot convert non-ads into ads. Sandusky argues that Medco's past, which includes having operated a mail-order pharmacy business and having violated the laws of various states, *see* R. 27 at 9–12, creates a genuine dispute of fact as to whether these faxes are ads. Appellant Br. 36. And it contends that Medco might financially benefit from these faxes several locks down the stream of commerce (conceivably through one of its illegal schemes). Sandusky's argument boils down to this: No matter what the faxes look like on their face, a jury might conclude that, taken together, they have a positive effect on Medco's business—and thus must have been sent to promote its products or services, with profit in mind. All publicity is apparently *financially* good publicity.

We reject this quasi substantial-effects test, as other courts have. *E.g.*, *Boehringer Ingelheim Pharmaceuticals*, 2015 WL 144728, at *5 ("[T]he hypothetical future economic benefit that the [] defendants might receive someday does not transform the Fax into an advertisement."); *Janssen Pharmaceuticals*, 2013 WL 486207, at *5 ("[T]he inquiry under the [Act] is whether the content of the message is commercial, not what predictions can be made about future economic benefits."); *Physicians HealthSource*, 2013 WL 5299134, at *2 (basing its decision on the "on the four corners of the facsimile"); *see also N.B. Industries*, 465 F. App'x at 642; *Turza*, 728 F.3d at 688. The fact that the sender might gain an ancillary, remote, and hypothetical economic benefit later on does not convert a noncommercial, informational communication into a commercial solicitation. Plus, no record evidence reliably shows that there would be such a financial benefit from these faxes; evidence of past illegal schemes is certainly not enough to create a genuine dispute of fact. (But more on this below.)

To be sure, a fax need not be an explicit sale offer to be an ad. It's possible for an ad to promote a product or service that's for sale without being so overt, as in the free-seminar

example, *see* 71 Fed. Reg. at 25973, or as in *Turza*, 728 F.3d at 688. The best ads sometimes do just that. But the fax itself must at least be an indirect commercial solicitation, or pretext for a commercial solicitation. If it's not, it's not an ad. And the record shows that these faxes were not. So they're not ads as a matter of law.

III

That would be that but for one more related issue. Sandusky requested discovery under Rule 56(d)—in the form of depositions, document requests, and expert opinions—to oppose Medco's summary-judgment motion. R. 24-1 at ¶¶ 3–4; *see* Fed. R. Civ. P. 56(d). Specifically, it sought evidence that would show "Medco's pecuniary interest in the nine prescription drugs touted in the ads; Medco's advertising practices; and the specific circumstances that led to the ads." R. 24 at 6. The district court denied its request, which it has the discretion to do. *See Cardinal v. Metrish*, 564 F.3d 794, 797 (6th Cir. 2009). But did the court abuse its discretion?

The answer is no for three independent reasons. *First*, our conclusion above answers part of this question. The possibility that future economic benefits will flow from a non-commercial fax, ancillary to the content of the fax, is legally irrelevant to determining whether the fax is an ad. And Sandusky wanted evidence of this sort. R. 24 at 6; *see* Appellant Br. 41–42. This evidence, being legally irrelevant, does not bear on a "material" issue of fact. Fed. R. Civ. P. 56(a). It thus cannot be the basis to reverse the district court's judgment on this issue. *Allen v. CSX Transp., Inc.*, 325 F.3d 768, 775–76 (6th Cir. 2003); *see Good v. Ohio Edison Co.*, 149 F.3d 413, 422–23 (6th Cir. 1998).

*Second*, the district court could have "deem[ed] as too vague the affidavits submitted in support of the motion." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008). In full, the one unsworn statement notified the court that Sandusky "will seek documents from Medco, take the depositions of the affiants, retain an expert for assistance, and conduct other discovery." R. 24-1 at ¶ 4. The motion (but not the unsworn statement) listed the "subjects" of the discovery. R. 24 at 6. Such a statement needs to do more: It must describe "exactly how [Sandusky] expects those materials would help [it] in opposing summary judgment." *Summers v. Leis*,

368 F.3d 881, 887 (6th Cir. 2004). The district court was within its discretion to find that this statement did not do that.

*Third*, Sandusky's motion "fail[ed] to meet the requirements of an affidavit" or declaration under Rule 56(d). *CareToLive v. FDA*, 631 F.3d 336, 345 (6th Cir. 2011). Such a motion must be supported by a proper "affidavit or declaration." Fed. R. Civ. P. 56(d). This one was not, and Sandusky concedes as much. Reply Br. 19. Sandusky's statement contained the date and a list of what it sought. But it "was not sworn to before a notary public nor signed under penalty of perjury pursuant to 28 U.S.C. § 1746." *CareToLive*, 631 F.3d at 345. So it was an improper Rule 56(d) motion. And without "having filed a proper affidavit [or declaration], the district court did not abuse its discretion by denying discovery." *Id.*

IV

Because no reasonable jury could conclude from this record that the faxes were commercial in nature, they are not "advertisements" under the Act. We affirm.

**Appendix A**

## FORMULARY NOTIFICATION

The health plans of many of your patients have adopted the Rx Selections™ or Preferred Prescriptions® Formulary, both of which are maintained by Medco. We would like to notify you of the plan-preferred medications within the lipid-lowering class.

When appropriate, please consider prescribing plan-preferred drugs, which may help lower medication costs for your patients.

### Plan-Preferred Lipid-Lowering Agents

**lovastatin**

**pravastatin**

**simvastatin**

***Advicor*®** (Abbott Labs)

***Altoprev*®** (Shionogi Pharma)

***Crestor*®** (AstraZeneca)

***Lipitor*®** (Pfizer)

***Vytorin*®** (Merck/Schering)

For a comprehensive list of all plan-preferred medications, call 1 800 211-1456 and request a copy of Medco's standard formularies. You can also view the formularies online by visiting **www.medcohealth.com**. Click the "Physicians" link and then the "Formulary" link.

As always, you make the final decision about which medications are right for your patients. Thank you for your attention to this important matter.

*medco*®

Medco and Preferred Prescriptions are registered trademarks and Rx Selections is a trademark of Medco Health Solutions, Inc.
© 2010 Medco Health Solutions, Inc. All rights reserved.

Medco manages the prescription drug benefit for the employers or health plans of many of your patients.

**Appendix B**

## FORMULARY UPDATE

The health plans of many of your patients have adopted the **Rx Selections**™ or **Preferred Prescriptions**® Formulary, both of which are maintained by Medco.

The brand-name medication *Levaquin*® is the only plan-preferred respiratory fluoroquinolone on the above-mentioned Medco standard formularies.

**When appropriate, please consider prescribing plan-preferred drugs, which may help lower medication costs for patients.**

| Nonpreferred brand respiratory fluoroquinolone | Plan-preferred brand respiratory fluoroquinolone |
|---|---|
| Avelox® | **Levaquin**<br><br>(Pricara, a division of Ortho-McNeil-Janssen Pharmaceuticals, Inc.) |

For a comprehensive list of all plan-preferred medications, call **1 800 211-1456** and request a copy of Medco's standard formularies. You can also view the formularies online by visiting **www.medcohealth.com**. Click the "Physicians" link and then the "Formulary" link.

As always, you make the final decision about which medications are right for your patients. Thank you for your attention to this important matter.



*medco*®

**Medco and Preferred Prescriptions** are registered trademarks and **Rx Selections** is a trademark of Medco Health Solutions, Inc.
© 2010 Medco Health Solutions, Inc. All rights reserved

**Medco manages the prescription drug benefit for the employers and health plans of many of your patients.**