RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

BRIAN J. LYNGAAS, D.D.S., P.L.L.C.,
                              *Plaintiff-Appellant*,

*v.*                                                                No. 24-1777

UNITED CONCORDIA COMPANIES, INC,
                              *Defendant-Appellee*.

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-11604—Jonathan J.C. Grey, District Judge.

Argued:  April 30, 2025

Decided and Filed:  June 9, 2025

Before:  SUTTON, Chief Judge; BATCHELDER and RITZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Phillip A. Bock, BOCK HATCH & OPPENHEIM, LLC, Chicago, Illinois, for Appellant.  Justin J. Kontul, REED SMITH, LLP, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:**  Phillip A. Bock, BOCK HATCH & OPPENHEIM, LLC, Chicago, Illinois, for Appellant.  Justin J. Kontul, REED SMITH, LLP, Pittsburgh, Pennsylvania, M. Patrick Yingling, REED SMITH LLP, Chicago, Illinois, for Appellee.

        RITZ, J., delivered the opinion (pp. 2–9, app. 10–12), of the court in which SUTTON, C.J., and BATCHELDER, J., concurred.  BATCHELDER, J. (pp. 13–14), delivered a separate concurring opinion.

---

**OPINION**

---

RITZ, Circuit Judge.   Brian Lyngaas, a dentist, sued dental insurance provider United Concordia Companies, Inc. (UCCI) for sending unsolicited faxed advertisements in violation of the Telephone Consumer Protection Act (TCPA).  The district court granted summary judgment for UCCI.  We reverse.

I.

Brian Lyngaas, acting as an agent of his eponymous dental practice, contracted with UCCI to participate in UCCI's Fee for Service Dental Network.  UCCI offered a range of benefits to dentists in this network.  One of those benefits was the "Value Add Program" (VAP), which provided discounts from third-party vendors.  UCCI negotiated exclusive deals with these vendors in exchange for promotion of the vendors' products, and UCCI memorialized the deals in "marketing" and "strategic" agreements.  As part of the VAP, UCCI sent out benefit materials via fax.

The litigation here centers on three faxes UCCI sent as part of the VAP.  UCCI sent the first fax in October 2020 and the last in May 2021.  These faxes, respectively, provided information on: (1) discounts on personal protective equipment (PPE) offered by Prophy Magic; (2) discounts on dentist-specific recycling buckets provided by Dental Recycling North America; and (3) promotional services for student loan refinancing by GradFin.  We append all three faxes at the end of this opinion.

Lyngaas filed a class action lawsuit against UCCI under the TCPA, alleging that UCCI sent him "at least two" unsolicited advertisements via a fax machine.  Lyngaas provided evidence that he received the Prophy Magic and DRNA faxes, but he was unable to show that he received the GradFin fax.

Lyngaas then filed a motion for summary judgment.  UCCI filed a cross-motion for summary judgment, arguing in part that the faxes at issue were not "advertisements" as defined

by the statute. The district court ruled in favor of UCCI, reasoning that the faxes were not advertisements because UCCI's profit incentive was too remote. *Lyngaas v. United Concordia Cos., Inc.*, No. 21-11604, 2024 WL 4236462, at \*4 (E.D. Mich. Aug. 29, 2024). Lyngaas appealed.

## II.

We review a district court's grant of summary judgment de novo. *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir 2020). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When we address cross-motions for summary judgment, we evaluate each party's motion on its own merits. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). We draw all reasonable inferences against the party whose motion is under consideration. *Id.*

We hold that UCCI's faxes were advertisements under the TCPA. UCCI facially promoted direct sales by its third-party partners, and its profit motive was sufficiently direct because it sent the promotions as part of negotiated marketing agreements. Our precedent further supports this conclusion by placing liability for third-party sales on the sender of a fax, rather than the seller of the product.

## A.

UCCI's faxes are advertisements under the TCPA because they facially promote third-party products as part of exclusive marketing agreements. The TCPA awards statutory damages against an entity that uses "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C). An "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5).

We have interpreted this language to require that an advertisement be commercial in nature. *See Matthew N. Fulton, D.D.S., P.C. v. Enclarity, Inc.*, 962 F.3d 882, 891 (6th Cir. 2020); *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 221-22 (6th Cir. 2015). Specifically, in *Sandusky*, we held that an ad (1) "must promote goods or services to be bought or sold," and (2) "should have profit as an aim." *Sandusky*, 788 F.3d at 222 (looking to dictionary definitions of "advertisement" and "commercial"). Also, the sender's profit motive must be sufficiently direct. "The fact that the sender might gain an ancillary, remote, and hypothetical economic benefit later on does not convert a noncommercial, informational communication into a commercial solicitation." *Id.* at 225.

The parties primarily dispute whether the faxes sent by UCCI qualify as an "advertisement" under this definition. UCCI argues that the faxes did not have profit as an aim, and any purported economic benefit UCCI could derive from them was hypothetical. Lyngaas responds that UCCI directly profits by maintaining and expanding their provider network through the VAP. Applying *Sandusky*, the district court agreed with UCCI, likening the VAP to an informational project that circulates benefits to pre-existing network members.

We disagree. The faxes were advertisements because (1) they were facially promotional, and (2) UCCI demonstrated a sufficiently direct profit interest by contracting with its marketing partners.

*Sandusky* is distinguishable. The defendant in *Sandusky* was a pharmacy benefit manager, which acted as an intermediary between sponsors of health insurance plans (generally employers) and prescription drug companies. 788 F.3d at 220. The plaintiff, Sandusky, was a healthcare provider. *Id.* As part of its services, the defendant produced a "formulary," which was a list of medications covered by a particular health insurance plan. *Id.* The defendant sent that formulary to its clients to aid in choosing healthcare plans, and also via fax to healthcare providers who prescribed medication to the defendant's clients' employees. *Id.* The purpose of the fax, accordingly, was to "inform[] Sandusky which drugs its patients might prefer, irrespective of [the defendant's] financial considerations." *Id.* at 221. Thus, the faxes at issue

were informational, and any profit-driven motive was too ancillary to render the faxes a commercial solicitation. *Id.* at 222, 225.

Here, unlike the formularies in *Sandusky*, the faxes facially sought to *sell* branded products. In *Sandusky*, we found it important that the defendant intermediary simply communicated which products would be cheaper for patients based on their health insurance coverage. *See id.* at 222. The faxes did not facially seek to influence actual purchasing decisions or attract new business. *Id.* at 222, 225. By contrast, there is little dispute that UCCI's faxes promoted goods and services to be sold. *See id.* at 222. UCCI's marketing contracts obliged it to market and promote its partners' offerings. In sending the faxes, UCCI sought to promote their business partners' products for sale to UCCI's own customers. To illustrate, the October 2020 fax let recipients know that "United Concordia recently collaborated with Prophy Magic[] to offer . . . a 10% discount on all PPE products." CA6 R. 28, Corr. Appellant Br., at 21. In addition to the discount, the bulletin touted Prophy Magic's brand: "Prophy Magic is a direct provider of superior products . . . [w]ith over 20 years of industry experience." *Id.* UCCI was similarly generous with publicity for its other partners, informing its dentists that "[f]or more than 20 years, DRNA has provided their affordable and efficient recycling solutions to a diverse roster of dental customers." *Id.* at 22. This language clearly promoted the products of UCCI's partners for sale.

UCCI's profit aim, moreover, was sufficiently direct to incur liability. Unlike information about differential drug rates in *Sandusky*, the promotional rates here were designed specifically for UCCI's network, and UCCI negotiated for them. As consideration for the more favorable rates, UCCI provided a network of customers for sellers of useful products. That is, the benefit of UCCI's bargain—the purpose of the contract—was the ability to offer the third parties' exclusive promotions to members of its network. Unlike the defendant in *Sandusky*, UCCI did not just passively compile relevant pricing information; rather, it built and circulated facially promotional materials on behalf of others. The only proffered explanation for this bargain is that UCCI sought to maintain and grow its provider network, which would in turn help grow its customer base.

UCCI argues that any economic benefit it derived from the faxes was purely hypothetical. But UCCI demonstrated that its profit motive was not just hypothetical when it entered into agreements to circulate promotions to its dentists. The third-party partners received highly effective marketing—that was the whole point. It makes sense that PPE companies and dental recycling servicers would contract for access to the fax machines of dentists, who presumably used PPE during the COVID-19 pandemic and regularly handled dental waste. And UCCI has provided no profit-neutral explanation for its own contracted benefit. *Cf. Mich. Urgent Care & Primary Care Physicians, P.C. v. Med. Sec. Card Co., LLC*, No. 2:20-CV-10353, 2020 WL 7042945, at *3 (E.D. Mich. Nov. 30, 2020) ("[I]t is clear . . . that the program being promoted is not a welfare program, nor is it one being run by a charity, non-profit, or philanthropic entity."). The contract therefore created a "commercial nexus" between the sale of third-party products and UCCI's business. *See Fulton*, 962 F.3d at 891 (quoting *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017)).

Instead of giving an alternative explanation, UCCI argues that this theory depends on a plethora of future conditions, such as whether fax recipients decide to stay in-network because of the faxes, and whether additional customers join. Those considerations ignore the fact that UCCI sent the faxes as consideration for receiving economic value, in the form of exclusive discounts from the vendors. Whether faxed ads are successful is a separate question than what the purpose of the ad was in the first place. For example, if UCCI sent unsolicited faxes promoting its dental insurance, it could not reasonably argue that it was not liable under the TCPA because the financial benefits were conditioned on whether customers purchased its product.

Put simply, UCCI directly had "profit as an *aim*" when it sent the faxes. *See Sandusky*, 788 F.3d at 223-24 (emphasis added). That is in contrast with *Sandusky*, where the defendant compiled the prices of medications as part of its job as an intermediary between drug companies and employers, not because "the drugs or [the defendant's] services [were] for sale." *Id.* at 222. The defendant in *Sandusky* provided the preexisting list to medical providers because it was useful information—providers would want to know which of two drugs would be cheaper for their patients, who were also the defendant's clients' employees. To be sure, the defendant may have calculated that providing this information made it a better pharmaceutical intermediary, but

it "[had] no interest whatsoever in soliciting business" from the fax recipient. *Id.* In short, in *Sandusky* there was no evidence that the defendant sent the formulary for the purpose of growing its business. *See id.* ("Nor does any record evidence show that [the defendant] hopes to attract clients or customers by sending the faxes.").

Here, though, such evidence exists. The marketing contracts suggest that UCCI sent these faxes with profits in mind. It is hard for UCCI to argue that its faxes were informational when it offered its network in exchange for advertised discounts in the first place. The only proffered explanation for the VAP is that UCCI, acting (understandably) out of direct profit motive, wanted to enhance benefits for its provider network and, in turn, attract new customers and profits.

Therefore, the district court erred when it found that the facts here were sufficiently analogous to those in *Sandusky*. UCCI's profit motive was sufficiently direct for liability under the TCPA.

B.

Additionally, UCCI can be liable even though it was not selling the products advertised by the faxes. Advertisements attempt to "promote[] the sale" of goods or services. *Id.* at 222; *see also Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 608 (7th Cir. 2023). As discussed above, the faxes here promoted the availability of Prophy Magic's PPE and DRNA's recycling buckets. The parties do not meaningfully dispute this point. Rather, UCCI suggests that a sender may not have profit as a direct aim when it is not promoting its own goods or services. The district court accepted this argument, reasoning that a ruling against UCCI would stop a generous citizen from clipping coupons and sending them out via fax machine. In particular, the court characterized the faxes as a not-for-profit activity separate from UCCI's insurance product, finding that "publishing discounts and selling discounted goods and services for other companies is not UCCI's business." *Lyngaas*, 2024 WL 4236462, at *3.

This interpretation of the TCPA runs afoul of two lines of our case law. First, we have regularly held that TCPA liability falls on the sender of a fax, rather than the seller of a product.

For example, in *Lyngaas v. Curaden Ag*, 992 F.3d 412, 424-25 (6th Cir. 2021)[1], we held that a Swiss toothbrush manufacturer was not liable for unsolicited fax advertisements sent by its American subsidiary simply because the Swiss manufacturer's products were featured in the faxes. In doing so, we affirmed the district court's determination that liability fell on the subsidiary as the sender. *Id.* at 419, 424–25, 438. The same was true in *Health One Medical Center, Eastpointe P.L.L.C. v. Mohawk, Inc.*, 889 F.3d 800, 802 (6th Cir. 2018), where a drug manufacturer was not liable for the unsolicited advertisements of its products sent by a medical wholesaler. We again emphasized that TCPA liability falls on the sender of the fax. *Id.*; *see also Garner Props. & Mgmt., LLC v. Marblecast of Mich., Inc.*, 810 F. App'x 454, 456 (6th Cir. 2020) (per curiam) (suggesting that one whose products appear on an unsolicited fax is not always a sender for the purpose of TCPA liability).

True, this line of cases is not perfectly analogous because the senders were also primarily marketing their own products. For example, in *Mohawk*, though the drug manufacturer's products were featured in the ad, they were also the products of the wholesaler that sent the faxes. 889 F.3d at 801. However, the cases show that TCPA liability generally falls on "senders," not "sellers." It is a small logical step to conclude that a sender may be liable for advertising a product it does not sell.

Second, *Sandusky* itself contemplated that the TCPA covers faxed advertisements when the sender profits indirectly. *See* 788 F.3d at 225; *Fulton,* 962 F.3d at 889 ("*Sandusky* thus does not entail . . . that the fax must propose a direct commercial transaction between the sender and the recipient."). So, UCCI's argument that the faxes must propose a transaction between UCCI and the recipient is misplaced. If UCCI stands to profit, then TCPA liability applies, even if the profits are more direct for the sales partner.

While we hold that TCPA liability applies to the sender of a third-party ad who profits indirectly, the reasoning is much weaker for a sender that truly has no profit motive, such as the district court's hypothetical do-gooder who transmits advertisements without *any* financial

---

[1]This Lyngaas is the same as the plaintiff in this case. To Lyngaas's credit, he has singlehandedly helped define the contours of TCPA liability in our circuit.

benefit. The facts here, especially when taken in the light most favorable to Lyngaas, easily clear the bar for liability under the TCPA. UCCI has presented no explanation for their marketing deals apart from profit. The VAP is, most logically, part of a mutually beneficial business relationship between UCCI and the direct sellers. Should the case of an altruistic coupon-clipper arise, it would be distinguishable.

Overall, our precedent tells us that circulating an advertisement for a third party's goods or services falls under the TCPA, at least if the sender has a financial interest in the seller's advertisement.

### III.

In sum, UCCI's faxes were advertisements under the TCPA. One final note, though: Lyngaas may not move forward with a lawsuit regarding a fax that he did not actually receive. The Gradfin fax must therefore be removed from litigation going forward. As to the remaining two faxes, we reverse the district court and remand for proceedings consistent with this opinion.

## APPENDIX A

# UNITED CONCORDIA®

# SPECIAL FAX BULLETIN

October 2020

## PPE DISCOUNT FOR UNITED CONCORDIA DENTISTS

Personal Protective Equipment (PPE) has become extremely important due to the COVID-19 pandemic to ensure the safety of our network dentists, their office staff, and our members. United Concordia was pleased to provide support to our valued dentists by allowing $10 per patient visit for dates of service from May 1, 2020 through September 30, 2020 to help cover the costs associated with purchasing masks, sterilization procedures, and other CDC requirements resulting from COVID-19. **As a friendly reminder, it's important to note that our network dentists' contracts prohibit billing United Concordia patients for PPE.**

**In an effort to find an alternative to assist your office with PPE, United Concordia recently collaborated with Prophy Magic\* to offer our network dentists a 10% discount on all PPE products.**

Prophy Magic is a direct provider of superior products and services within the dental community. With over 20 years of industry experience, they specialize in disposable dental products, including infection control and PPE solutions.

Prophy Magic understands the importance of these products to dental practices and strives to provide significant value through affordable direct pricing, excellent customer service and expedient shipping. Their constant focus on quality has earned Prophy Magic's product catalog several awards for excellence, including the esteemed "CR Choice" award on their Prophy Angle line.

United Concordia is dedicated to providing our network dentists with unwavering support throughout the COVID-19 pandemic and beyond. We are pleased to have this opportunity to show our appreciation and thank you for your continued commitment to our members and their health and safety.

**To take advantage of this discount on PPE products, please visit unitedconcordia.com/dental-insurance/dentist/discounts/, or contact Prophy Magic directly by visiting prophymagic.com or calling 1-866-54-MAGIC (62442). Use Promo Code UCPPE at checkout.**

\*Prophy Magic is not affiliated with United Concordia and is solely responsible for its own products and services.

NOTICE OF CONFIDENTIALITY: This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged or confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you receive this message by error, please notify us immediately and destroy the related message.

Confidential                                                                CONC-LYNG-000137

---

**APPENDIX B**

---

# UNITED CONCORDIA
# SPECIAL FAX BULLETIN

### March 2021

## CHAIRSIDE AMALGAM RECYCLING BUCKETS
## AVAILABLE FROM DRNA

As you know, it is important to recycle Evac-u-Traps and scrap amalgams properly. Dental Recycling North America (DRNA) makes this easy with their Chairside Amalgam Recycling buckets, which can be used to recycle amalgam capsules, Dispos-a-Traps, teeth with amalgams, scrap amalgams, Evac-u-Traps, etc.

The following are a few additional benefits of DRNA's Chairside Amalgam Recycling buckets.
- No contract
- On-demand pick-up and prepaid return shipping
- Three sizes available: 1.25 gallon, 2.5 gallon and 5 gallon
- Liquid control procedures to maximize safety
- Waste recycling at EPA-certified facility
- Complete audit trail for collected waste
- Compliance certification

For more than 20 years, DRNA has provided their affordable and efficient recycling solutions to a diverse roster of dental customers, including private practices, dental schools, DSO's, hospitals and other health institutions.

United Concordia and DRNA are delighted to offer network dentists a 20% discount on DRNA products and services, including Chairside Amalgam Recycling buckets.

To take advantage of this offer, contact ▓▓▓ at ▓▓▓▓▓▓▓▓ email ▓▓▓▓▓▓▓▓ or visit www.drna.com/contact.php.



**DRNA**
*Dental Recycling North America*

*DRNA is not affiliated with United Concordia and is solely responsible for its own products and services.

NOTICE OF CONFIDENTIALITY: This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged or confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you receive this message by error, please notify us immediately and destroy the related message.

---

**APPENDIX C**

---

UNITED CONCORDIA®

# SPECIAL FAX BULLETIN

#### May 2021

## UNITED CONCORDIA NETWORK DENTISTS CAN REDUCE STUDENT LOAN DEBT WITH GRADFIN!

United Concordia is committed to offering our network dentists a variety of ways to save both time and money. To address the complexities of student loan debt, we are pleased to collaborate with GradFin, a leader in student loan refinancing, consolidation, and new loan origination.

### How GradFin Can Help

GradFin's comprehensive solutions and education can help United Concordia network dentists save money and reduce student loan debt.

- **Expert Loan Analysis:** GradFin provides free one-on-one consultations to determine ideal loan financing and consolidation strategies.

- **Education and Support for New and Existing Loans:** GradFin offers assistance with student loan refinancing, consolidation, and new loan origination services.

- **11 Flexible Third-Party Lenders:** GradFin can match borrowers with 11 flexible third-party lenders for the most competitive rates available.

- **Flexible Loan Terms:** Borrowers can choose from a variety of fixed and variable loan terms between 5 and 20 years.

- **Valuable Savings:** GradFin borrowers save an average of $38,000 over the term of their loans!*

GradFin's vast knowledge of student loan repayment and refinancing options in the market today makes them an invaluable resource for anyone with student loan debt. They understand that each borrower's student loan situation is different and that loan types can vary. GradFin focuses on helping each borrower through a personalized approach tailored to their specific situation.

To learn more, visit **goto.gradfin.com/ucdentists/** or call **1-844-GRADFIN** to schedule your free 30-minute phone consultation with a GradFin financial expert!

*Average savings over the lifetime of a loan. GradFin internal research; 2020.
**GradFin is not affiliated with United Concordia and is solely responsible for its own products and services.

NOTICE OF CONFIDENTIALITY: This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged or confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you receive this message by error, please notify us immediately and destroy the related message.

Confidential       CONC-LYNG-000117

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge, concurring. I agree with the majority opinion that United Concordia Companies had a profit motive for sending the faxes at issue here. But I write separately because I do not believe that the Telephone Consumer Protection Act requires plaintiffs to show that a fax's sender had a profit motive. Rather, the Act imposes liability on "any person" who sends an unsolicited advertisement through fax, 47 U.S.C. § 227(b)(1)(C), and it defines an "advertisement" as "*any* material advertising the commercial availability or quality of *any* property, goods, or services," § 227(a)(5) (emphases added). And so, under that definition—which mentions nothing about a sender's reason for sending a fax—all that matters for a fax to qualify as an advertisement under the Act is that the fax "promotes the sale . . . of any property, goods, or services available to be bought or sold so that *some* entity can profit." *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 222 (6th Cir. 2015) (emphasis added).

True, *Sandusky* does mention elsewhere that a fax qualifies as an advertisement if the "sender" has "profit as an aim." *Id.* at 223-24. But that lone reference is not enough to create such an atextual requirement because we do not read judicial opinions as if they were statutes. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (condemning attempts to "dissect the sentences of the United States Reports as though they were the United States Code"). Instead, we focus on the court's holding, and *Sandusky* held that the Telephone Consumer Protection Act is not violated when an unsolicited fax does not contain commercial components. *See Sandusky*, 788 F.3d at 222 ("these faxes . . . lack the commercial components inherent in ads"). And this principle applies with special force here given that the sender of the fax in *Sandusky* was also the supposed seller there, and so—unlike here—the court had no need to distinguish between senders and sellers. *See Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019) (explaining that we should not blindly follow an opinion's broad statement that happens to touch on another issue that the parties there did not litigate because "questions which merely lurk

in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents").

So, in sum, because there can be no doubt that the faxes here promoted the sale of the third-party vendors' products and services so that those vendors could profit, the faxes here qualify as advertisements under the Telephone Consumer Protection Act. Because the majority opinion reaches the same conclusion, albeit for a different reason, I concur in the majority's decision.